```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3     _____

 4     UNITED STATES OF AMERICA,

 5                         Plaintiff,
                                           DOCKET NO. 1:20-mj-416
 6     vs.

 7
       ADAM FOX, TY GARBIN,
 8     KALEB FRANKS, DANIEL HARRIS,
       BRANDON CASERTA,
 9
                         Defendants.
10     _____/

11

12          TRANSCRIPT OF VOLUME I OF PRELIMINARY HEARING

13        BEFORE UNITED STATES MAGISTRATE JUDGE SALLY J. BERENS

14                     GRAND RAPIDS, MICHIGAN

15                        October 13, 2020

16

17     Court Reporter:         Glenda Trexler
                               Official Court Reporter
18                             United States District Court
                               685 Federal Building
19                             110 Michigan Street, N.W.
                               Grand Rapids, Michigan 49503
20

21     Proceedings reported by audio recording, transcript produced by

22     computer-aided transcription.

23

24

25
```

```
 1   A P P E A R A N C E S:

 2   FOR THE GOVERNMENT:

 3        MR. NILS R. KESSLER
          UNITED STATES ATTORNEY'S OFFICE
 4        330 Ionia Avenue, N.W.
          P.O. Box 208
 5        Grand Rapids, Michigan 49501-0208
          Phone:  (616) 456-2404
 6        Email:  Nils.Kessler@usdoj.gov

 7        MR. AUSTIN JACOB HAKES
          UNITED STATES ATTORNEY'S OFFICE
 8        330 Ionia Avenue, N.W.
          P.O. Box 208
 9        Grand Rapids, Michigan 49501-0208
          Phone:  (616) 456-2404
10        Email:  austin.hakes@usdoj.gov

11   FOR THE DEFENDANT ADAM FOX:

12        MS. HELEN C. NIEUWENHUIS
          FEDERAL PUBLIC DEFENDERS OFFICE
13        50 Louis Street, N.W., Suite 300
          Grand Rapids, Michigan 49503-2633
14        Phone:  (616) 742-7420
          Email:  Helen_nieuwenhuis@fd.org
15
     FOR THE DEFENDANT CASERTA:
16
          MR. MICHAEL DARRAGH HILLS
17        HILLS AT LAW, PC
          425 South Westnedge Avenue
18        Kalamazoo, Michigan 49007
          Phone:  (269) 373-5430
19        Email:  mhills@hillslawoffice.com

20   FOR THE DEFENDANT GARBIN:

21        MR. GARY K. SPRINGSTEAD
          SPRINGSTEAD, BARTISH, BORGULA & LYNCH
22        28A West Main Street
          Fremont, Michigan 49412
23        Phone:  (231) 924-8700
          Email: gary@springsteadbartish.com
24

25
```

```
 1    FOR THE DEFENDANT HARRIS:

 2         MR. THOMAS WILLIAM PARKER DOUGLAS
           DOUGLAS LAW, PLLC
 3         106 East 8th Street
           Holland, Michigan 49423
 4         Phone:  (801) 699-7746
           Email:  parkerdouglas66@gmail.com
 5
      FOR THE DEFENDANT FRANKS:
 6
           MR. SCOTT GRAHAM
 7         SCOTT GRAHAM, PLLC
           1911 West Centre Avenue, Suite C
 8         Portage, Michigan 49024
           Phone:  (269) 327-0585
 9         Email:  sgraham@scottgrahampllc.com

10                         *   *   *   *   *

11                              Grand Rapids, Michigan

12                              October 13, 2020

13                              9:40 a.m.

14                     P R O C E E D I N G S

15         THE COURT:  Good morning.  This is the date and time

16    set for a preliminary hearing in this matter.  Let's start with

17    appearances and introductions.

18         MR. KESSLER:  Good morning, Your Honor, Nils Kessler

19    for the United States, and seated to my left is Austin Hakes

20    also for the United States.

21         THE COURT:  Good morning.

22         MS. NIEUWENHUIS:  Helen Nieuwenhuis on behalf of

23    Adam Fox, Your Honor, and he is here today and present and

24    seated to my left.

25         THE COURT:  Good morning to both of you.
```

```
 1              MS. NIEUWENHUIS:  Good morning.

 2              MR. HILLS:  Michael Hills on behalf of

 3    Brandon Caserta who is sitting to my right.

 4              THE COURT:  Good morning.

 5              MR. HILLS:  Good morning.

 6              MR. SPRINGSTEAD:  Good morning, Your Honor,

 7    Gary Springstead on behalf of Ty Garbin, and seated to his left

 8    is Nicole Springstead a law clerk in our office.

 9              THE COURT:  Good morning.

10              MR. DOUGLAS:  Good morning, Your Honor,

11    Parker Douglas on behalf of Daniel Harris who is seated to my

12    right.

13              THE COURT:  Good morning.

14              MR. GRAHAM:  Good morning, Your Honor, Scott Graham

15    on behalf of Kaleb Franks who is seated to my left.

16              THE COURT:  Good morning to you as well.

17              All right.  As an initial matter, I understand that,

18    Mr. Springstead, that you and Attorney Mark Satawa would like

19    to substitute for Mr. Mitchell who was originally appointed in

20    this case?

21              MR. SPRINGSTEAD:  That's correct, Your Honor.

22              THE COURT:  And, Mr. Garbin, is that your intent?

23    You've retained Mr. Springstead?

24              DEFENDANT GARBIN:  Yes, Your Honor.

25              THE COURT:  All right.  You understand that if you
```

1    are ever not able to afford Mr. Springstead's services that you

2    can petition the court and a lawyer would be appointed to

3    represent you?

4             *DEFENDANT GARBIN:*  Yes, Your Honor.

5             *THE COURT:*  All right.  We'll grant that motion to

6    substitute.

7             As I said, today is the date and time that was set

8    for a preliminary hearing as well as bond hearings in this

9    case.  I intend to take up the preliminary hearing first, and

10   two of the defendants, Mr. Fox and Mr. Garbin, have indicated

11   that they wish for some more time for the prelim and for their

12   bond hearings.

13            We are going to, nonetheless, go forward with the

14   preliminary hearing, at least as to the defendants' [sic]

15   witness, and then have them complete their portion of the

16   preliminary hearing at a later time, most likely on Friday, as

17   well as their bond hearings on that date.

18            Have I stated that correctly, Ms. Nieuwenhuis?  Are

19   you in agreement with that?

20            *MS. NIEUWENHUIS:*  We are, Your Honor, and I've spoken

21   to Mr. Fox and he is as well.

22            *THE COURT:*  All right.  And, Mr. Springstead, also

23   for you?

24            *MR. SPRINGSTEAD:*  Yes, Your Honor.  Thank you.

25            *THE COURT:*  Very well.  Then if there's nothing else

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   we need to take up, Mr. Kessler.

2           MR. KESSLER:  Yes, Your Honor.  Do you mind if I take

3   it off, Your Honor?

4           THE COURT:  No, it's fine.

5           MR. KESSLER:  The government calls Special Agent

6   Richard Trask of the FBI.

7           THE CLERK:  Please raise your right hand.

8                        RICHARD TRASK

9                 (The oath was administered)

10          THE WITNESS:  Yes, I do.

11          THE CLERK:  Please state and spell your name for the

12  record.

13          THE WITNESS:  Hello.  My name is Special Agent

14  Richard J. Trask.  Last name is T-R-A-S-K, and I'm a special

15  agent with the FBI.

16                      DIRECT EXAMINATION

17  BY MR. KESSLER:

18  Q.   Good morning, Agent Trask.

19  A.   Good morning.

20  Q.   How long have you been working for the FBI?

21  A.   I've been with the FBI approximately nine and a

22  half years.

23  Q.   And before that you were a sworn federal agent before that

24  as well, correct?

25  A.   That is correct.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1  Q.   All right.  So you've been in federal law enforcement

2  about 15 years?

3  A.   That's correct.

4  Q.   What types of cases do you normally handle for the FBI

5  nowadays?

6  A.   Counter-terrorism, domestic terrorism, and

7  counter-intelligence cases.

8  Q.   And you were the affiant in the Criminal Complaint that

9  was filed last Tuesday, correct?

10  A.   Correct.

11  Q.   Now, some of the information in there came from your

12  personal knowledge, but you also gathered information from

13  quite a few other agents, right?

14  A.   That's correct.

15  Q.   And was that a multistate effort?

16  A.   Absolutely.

17  Q.   And it also involved some information that was obtained

18  from informants?

19  A.   That's correct.

20  Q.   All right.  Everything that you swore to in the Affidavit

21  is true and correct to the best of your knowledge?

22  A.   Yes, it is.

23  Q.   Do you wish to adopt that Affidavit as part of your

24  testimony here today?

25  A.   I do.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   Q.   So let's focus on a few highlights from that Affidavit.

2   Let's go back to the beginning of this year.  Were the FBI and

3   local law enforcement monitoring any particular groups on

4   social media?

5   A.   At that time, yes.

6   Q.   What were they monitoring them for?

7   A.   For potential threat streams that they had stated or

8   potential issues that they had stated towards the government

9   officials.

10  Q.   Now, when you say government officials, we all know that

11  this particular case we're talking about involved

12  Governor Whitmer of Michigan.  Were there other government

13  officials that were potentially under threat in other states?

14  A.   That's correct.

15  Q.   Okay.  Let's go back to June 6th of 2020.  Was there a

16  meeting in Dublin, Ohio, that the FBI became aware of?

17  A.   Yes.

18  Q.   And what was the nature of that meeting?

19  A.   It was a meeting of individuals from multiple states to

20  discuss possible directions heading forward and to discuss

21  possible scenarios for planning.

22  Q.   Okay.  Now, when you say individuals from various states,

23  what do these individuals have in common?

24  A.   All of them were multiple militias from different states

25  and were also initially tied to this plan.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   Q.   Okay.  And I want to clarify something.  You mentioned

2   militias.  That term is used differently by different people.

3   A.   Yes.

4   Q.   We're not talking about the National Guard here, right?

5   A.   No.

6   Q.   These are groups that call themselves militias?

7   A.   Correct.

8   Q.   But they are not under any government authority or

9   anything like that?

10   A.   That's correct.

11   Q.   Okay.  So a number of different self-titled militia group

12   members gathered in Dublin, Ohio?

13   A.   That's correct.

14   Q.   Okay.  And from how many states, off the top of your head?

15   Is it two or three or more than that even?

16   A.   Off the top of my head it was at least four to five.

17   Q.   Okay.  Different states had representatives?

18   A.   Yes.

19   Q.   Now, when you say they were talking about planning next

20   steps, what kinds of things did they discuss at this meeting?

21   A.   At this meeting they discussed possible targets, taking a

22   sitting governor.  Specifically issues with the governor of

23   Michigan and Virginia based upon the lockdown orders.

24   Q.   Okay.  Now let's back up a little.  You say based on the

25   lockdown orders.  Are you talking about various governors

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   having orders that restricted businesses, things like that,

2   because of the COVID virus?

3   A.   That's correct.

4   Q.   All right.  So these groups had a problem with that.  And

5   then you mentioned wanting to take a sitting governor.  Exactly

6   what did they mean by that?

7   A.   The understanding at that time was to potentially kidnap a

8   sitting governor and remove him from office.

9   Q.   Okay.  And among the militia members that were there, was

10  there also someone who became a government informant?

11  A.   Yes.  Yes.

12  Q.   And that's how you found out what was discussed at the

13  meeting?

14  A.   That's correct.

15  Q.   All right.  Mr. Fox, who is seated to my right, did he

16  attend that meeting?

17  A.   Yes, he did.

18  Q.   And we have one other defendant that was named in the

19  Criminal Complaint, a Barry Croft of Delaware who is not here

20  with us today.  Was he also at that meeting?

21  A.   Yes, he was.

22  Q.   Okay.  You mentioned that they were talking about taking a

23  sitting governor.  Did they agree on any other steps for

24  recruiting or spreading their message at that meeting?

25  A.   The plan for after that was to take that -- or their plan

1    back and recruit members utilizing social media for future

2    plans.

3    Q.   Okay.  Now, Mr. Fox is from Michigan, right?  So he came

4    back to Michigan?

5    A.   That's correct.

6    Q.   And did you become aware of him reaching out to any local

7    self-titled militia groups here in Michigan?

8    A.   Yes.  He reached out to the Wolverine Watchmen.

9    Q.   Okay.  So you mentioned a group by the name of

10   Wolverine Watchmen.  They are one of these militia-type groups?

11   A.   That's correct.

12   Q.   Were they involved in some of those armed protests we've

13   all seen on TV at the state Capitol?

14   A.   That's correct.

15   Q.   Where people showed up in combat gear with assault rifles?

16   A.   Yes, they were.

17   Q.   Okay.  And had FBI already been watching them because of

18   that?

19   A.   They were watching them prior to that.

20   Q.   Even before that?

21   A.   Yes.

22   Q.   Okay.  Was there an informant that FBI started working

23   with who was inside the Wolverine Watchmen?

24   A.   Yes.

25   Q.   Okay.  And that person is referred to in the

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1  Complaint Affidavit as CHS-2; is that correct?

2  A.   That's correct.

3  Q.   What was it that brought that informant forward?

4  A.   The informant came to local law enforcement based upon

5  concerns about some of the directions that the group was headed

6  and the potential violence that they were discussing.

7  Q.   Was there anything in particular that the

8  Wolverine Watchmen were discussing doing that concerned this

9  informant?

10  A.   At that time there was discussion about removing the

11  governments -- or the governor and potentially storming the

12  Capitol.

13  Q.   Did they also talk about attacking law enforcement

14  officers?

15  A.   Yes.

16  Q.   Okay.  Now, that informant has worked with the FBI

17  throughout this case, correct?

18  A.   That's correct.

19  Q.   So it wasn't somebody who was working off any criminal

20  charges or anything like that, just concerned about what he was

21  hearing?

22  A.   Exactly.

23  Q.   Okay.  And has the information he's given you throughout

24  the case been corroborated by other information to make you

25  believe he's reliable?

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   A.   Yes, it has.

2   Q.   So you mentioned Mr. Fox came back here and connected with

3   the Wolverine Watchmen.  Did he do that through social media?

4   A.   I believe that was how the initial meeting or the initial

5   contact took place.

6   Q.   Okay.  And have you issued search warrants to Facebook,

7   for example?

8   A.   Yes, I have.

9   Q.   Okay.  And Mr. Fox was active on that?

10  A.   Yes, he was.

11  Q.   I want to go back to June 18th, which is just about a week

12  and a half after that Dublin, Ohio, meeting.  There was a

13  Second Amendment rally at the state Capitol, correct?

14  A.   Yes.

15  Q.   And that was another one of those things where groups came

16  together with assault weapons at the state Capitol?

17  A.   That's correct.

18  Q.   Did Mr. Fox meet with some of the Wolverine Watchmen

19  leadership at that rally?

20  A.   Yes, he did.

21  Q.   And Mr. Garbin is seated behind me here.  Was Mr. Garbin

22  part of the Wolverine Watchmen's leadership?

23  A.   Yes, he was.

24  Q.   All right.  Did Mr. Fox explain to Mr. Garbin what his

25  plan was with regard to the Capitol?

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    A.    Yes, he did.

2    Q.    And what did he tell him according to the informant?

3    A.    According to the informant at that time his plan was to

4    storm the Capitol and take it by force.  And he stated he would

5    need probably 200 men.

6    Q.    And if they stormed the Capitol, what would they do with

7    the governor if she was there, according to Fox?

8    A.    The plan was ultimately to take her and place her on trial

9    at a different location.

10   Q.    Okay.  Did Mr. Fox discuss at this time and other times

11   throughout the investigation what his timeline was, if there

12   was a deadline by which he wanted to do it?

13   A.    On multiple occasions he mentioned -- cited the

14   November 3rd election as kind of an end point to this.

15   Q.    So you're saying the operation, whatever operation he

16   wanted to do, would have to be accomplished by then?

17   A.    That's correct.

18   Q.    All right.  Now, Mr. Fox lives and works here in

19   Grand Rapids, correct?

20   A.    That's correct.

21   Q.    Where did he work -- before we get to where he lived,

22   where did he work at?

23   A.    The Vac Shack located in Wyoming.

24   Q.    All right.  And that's a vacuum cleaner repair shop on

25   South Division not too far from the courthouse; is that

1    correct?

2    A.    That's correct.

3    Q.    You mentioned that he was living there too.  Did you

4    become aware through the informant and other people that he was

5    living in the vacuum cleaner repair shop?

6    A.    That's correct.

7    Q.    And what part of the shop was he living in?

8    A.    Mr. Fox lived in the basement area which was located under

9    a trap door under a rug in the Vac Shack on the main floor.

10   Q.    All right.  So we just mentioned that on June 18th they

11   met at a Second Amendment rally at the Capitol.  Did Mr. Fox

12   invite members of the Wolverine Watchmen leadership to meet

13   with him at the Vac Shack later that week?

14   A.    That's correct.

15   Q.    So let's fast forward a little to June 20th.  Did you

16   become aware of a meeting that took place at the Vac Shack?

17   A.    Yes.

18   Q.    What part of the store did they meet in?

19   A.    They initially met up front -- upstairs, and then they all

20   traversed downstairs into the basement after removing their

21   cell phones.

22   Q.    Now, you said after removing their cell phones.  What

23   exactly happened with regard to the cell phones?

24   A.    Prior to going down to the basement to have discussion

25   Mr. Fox advised everybody to leave their cell phones upstairs

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    so they couldn't be monitored, and then they went down to the

2    basement to have their conversation.

3    Q.    So when you say they couldn't be monitored, are we talking

4    about operational security, just making sure nobody could

5    listen in on their calls, on their discussions?

6    A.    Yes.

7    Q.    Was Mr. Garbin there as well?

8    A.    Yes, he was.

9    Q.    And other members of the Wolverine Watchmen?

10   A.    That's correct.

11   Q.    Okay.  Did they discuss the plot again according to the

12   informant?

13   A.    Yes.

14   Q.    And did they make any mention if they were going to storm

15   the Capitol or carry out any other kind of plot like that about

16   what they would do with police vehicles?

17   A.    During that time on audio it's believed to be that Mr. Fox

18   stated to fire bomb the police vehicles in the lot to prevent a

19   law enforcement response.

20   Q.    Okay.  Now, the Wolverine Watchmen have some different

21   training meetings from time to time, correct?

22   A.    That's correct.

23   Q.    Have you heard the term "FTX"?

24   A.    Yes, I have.

25   Q.    And what does that stand for?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1  *A.*   It's field training exercise.

2  *Q.*   And is that an official term that you use at the FBI or is

3  it something they all talk about within this group?

4  *A.*   We would use it in the FBI or in the military.

5  *Q.*   Okay.  So some of these self-titled militia groups use

6  some military lingo like that?

7  *A.*   That's correct.

8  *Q.*   All right.  So can you define what happens at one of these

9  FTXs based on what you've heard from the informant?

10  *A.*   Based upon what I heard, it was everything from firearms

11  training, medical training, movements, and drills.

12  *Q.*   And you've had a chance to actually review some video from

13  some of those, correct?

14  *A.*   That's correct.

15  *Q.*   And photos?  Okay.  Let's go forward to June 28th.  Did

16  the group, the Wolverine Watchmen, have a training session in

17  Munith, Michigan?

18  *A.*   Yes, they did.

19  *Q.*   And who is in Munith?

20  *A.*   Munith is -- if I could go to my notes?

21  *Q.*   Sure.

22  *A.*   I don't recall offhand.  I believe that's --

23  *Q.*   It's not one of these defendants?

24  *A.*   No.

25  *Q.*   I don't think anyone will object since he's not here.

1    Mr. Musico?

2    A.   Yes, that's correct.

3    Q.   Do you know who Pete Musico is?

4    A.   Pete Musico is one of the leaders of the

5    Wolverine Watchmen and the founders.

6    Q.   And that's where he lives, correct?

7    A.   That's correct.

8    Q.   So did Mr. Fox, Mr. Garbin, Mr. Franks, and Caserta,

9    Mr. Caserta attend, that meeting in Munith?

10   A.   Yes, they did.

11   Q.   Did anybody talk about kidnapping at that meeting?

12   A.   Yes, it was mentioned by -- it was Pete Musico mentioning

13   that:  "If you're not okay with kidnapping, then you need to

14   leave at this point."

15   Q.   All right.  And we mentioned Mr. Fox, Garbin, Franks, and

16   Mr. Caserta.

17        Now let's first start with Mr. Franks.  Mr. Franks had

18   already left the meeting before whoever said that?

19   A.   That's correct.

20   Q.   Or before Mr. Musico said that?

21   A.   That's correct.

22   Q.   But for some unrelated reason as far as you know?

23   A.   As far as we know it was not related to this incident or

24   the statements.

25   Q.   Sometime after Mr. Franks left, though, Mr. Musico said,

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    "If you're not up for kidnapping, you need to leave"?

2    A.    That's correct.

3    Q.    And did Mr. Fox, Mr. Garbin, and Mr. Caserta stay after

4    that?

5    A.    Yes.  Yes, they did.

6    Q.    Stayed until the end of the meeting?

7    A.    That's correct.

8    Q.    All right.  They had another field training exercise or

9    FTX between July 10th and 12th over a weekend, correct?

10   A.    That's correct.

11   Q.    Was that in Wisconsin?

12   A.    That's correct.

13   Q.    Mr. Fox, Mr. Croft, Mr. Garbin, Mr. Franks, and

14   Mr. Caserta attended that one, correct?

15   A.    Correct.

16   Q.    Did they have firearms training again there?

17   A.    Yes, they did.

18   Q.    Okay.  Let's take a look at a couple of exhibits so we can

19   see what those look like.  I'm going to bring up Exhibit 1 for

20   identification.

21        Is that a photograph from one of the field training

22   exercises?

23   A.    That's correct.

24   Q.    And do you recognize anybody in that photograph?

25   A.    Yes.  Kaleb Franks is on the left-hand side in the

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

 1    picture.

 2    *Q.*   All right.  So I don't know if this is going to show up if

 3    I circle it here, but -- well, it doesn't work that way.

 4         This guy right here?

 5    *A.*   That's correct.

 6    *Q.*   Okay.

 7              *THE COURT:*  Hang on just a second, Mr. Kessler.

 8    *Q.*   *(BY MR. KESSLER)*  So you said that was Kaleb Franks over

 9    there on the far left of the picture?

10    *A.*   Yes.

11    *Q.*   Is there anything unusual about the rifle he's holding

12    there?

13    *A.*   He has a suppressor on the end of the rifle.

14    *Q.*   When you say "a suppressor," is that what people often

15    refer to as a silencer?

16    *A.*   That's correct.

17    *Q.*   What is the normal accepted purpose for a silencer?  What

18    would you use a silencer for in the military or in the FBI?

19    *A.*   Typically to minimize the noise level.  Additionally to

20    break the flash to minimize detection.

21    *Q.*   Okay.  Now, we can see that everybody in this photograph

22    is actually wearing headphones.  So they are not doing it for

23    ear protection, correct?

24    *A.*   That would be correct.

25    *Q.*   So the purpose of a silencer would be so other people

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    can't hear you shooting your gun, right?

2    A.   That's correct.

3    Q.   And flash suppression would be so other people can't see

4    where you're shooting from; is that right?

5    A.   That's correct.

6    Q.   Okay.  Did they also practice some dynamic drills where

7    they kind of mimic situations you might have in combat?

8    A.   That's correct.

9    Q.   Okay.  Let me bring up what I --

10          MR. KESSLER:  I would offer this into evidence unless

11   there's any objection.

12          THE COURT:  Any objection?

13          MR. GRAHAM:  No, Your Honor.

14          MR. HILLS:  No, Your Honor.

15          MR. DOUGLAS:  No, Your Honor.

16          THE COURT:  All right.  It's admitted.

17          MR. KESSLER:  Can we bring up Exhibit 2 for

18   identification?  And let me hit play here.

19       (Video playing)

20   Q.   (BY MR. KESSLER)  Was that Mr. Caserta that we just saw

21   there in the video?

22   A.   That's correct.

23   Q.   And the other gentleman was?

24   A.   I'm not sure right offhand.

25   Q.   All right.  So those are the kind of drills that they did

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    at these FTXs?

2    A.   That's correct.

3    Q.   Was there also -- did they also attempt to explode an

4    improvised explosive device at that meeting?

5    A.   Yes, they did.

6    Q.   Now, when you say an IED or an improvised explosive

7    device, can you just explain what that means?

8    A.   It's a device made out of regularly available materials

9    which is intended to explode and create some sort of explosion.

10   Q.   Okay.  So let's distinguish it from just a firework, for

11   example, that might be for people's entertainment.

12       Did they do anything with this improvised explosive device

13   that they used at this field training that would make it

14   dangerous to human beings?

15           MR. GRAHAM:  Your Honor, I would object.  Only to the

16   use of the term "they."  It's so vague I have no idea who he's

17   talking about.

18           THE COURT:  Can you be a little bit more specific?

19   Q.   (BY MR. KESSLER)  Who, if anyone, that you're aware of

20   actually attempted to detonate an IED at this meeting?

21   A.   From what I'm being told, I know that Barry Croft was part

22   of that and a couple other individuals.

23   Q.   Okay.  But they all attended this meeting --

24   A.   That's correct.

25   Q.   -- where it was done?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1       All right.  What, if anything, did they do to this

2   explosive device that might be intended to harm human beings?

3   A.   They placed shrapnel into that.

4   Q.   When you say "shrapnel," what does that mean?

5   A.   Shrapnel can be anything from small objects that are

6   intended to fly out and create some sort of damage from the

7   blast zone.

8   Q.   Okay.  So metal objects that would fly out and hit people?

9   A.   Yes.  That's correct.

10  Q.   There's no entertainment value to doing anything like

11  that, correct?

12  A.   No.

13  Q.   Okay.  Let's go forward about a week to July 18th.  Did

14  Mr. Fox, Mr. Croft, Garbin, Harris, and Franks meet up in Ohio?

15  A.   That's correct.

16  Q.   Did they discuss doing anything at that meeting?

17  A.   Yes.  During there it was suggested that they could

18  potentially attack MSP outposts or Michigan State Police

19  outposts or stations.

20  Q.   Okay.  Now, you had talked earlier about in their initial

21  phases these gentlemen were talking about attacking the

22  Capitol.  With regard to Mr. Garbin, did he have an opinion on

23  trying to attack the Capitol?

24  A.   At that time shortly after the meeting there was a side

25  conversation and Mr. Garbin stated he was not okay with the

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   Capitol but he would be okay with shooting the governor's

2   house.  Or her vacation home.

3   Q.   Okay.  You say her private vacation home?

4   A.   That's correct.

5   Q.   And we're going to avoid actually showing or talking about

6   exactly where that is because there's obviously publicity

7   around the case.  But fair to say it's in Northern Michigan?

8   A.   That's correct.

9   Q.   Okay.  Would it also be fair to say that the Capitol would

10  be a harder target than a vacation home in a rural part of

11  Northern Michigan?

12  A.   That's correct.

13  Q.   Okay.  On August 9th did they have another training

14  session in Munith?

15  A.   That's correct.

16  Q.   Attended by Mr. Fox, Garbin, Harris, and Franks?

17  A.   Yes.

18  Q.   Okay.  Did Mr. Fox specifically bring up the notion of

19  kidnapping the governor at that meeting?

20  A.   Yes, he did.

21  Q.   Okay.  Mr. Harris had some skepticism about discussing it

22  at that meeting, correct?

23  A.   Yes.

24  Q.   What's your understanding from talking to the informant

25  and reviewing the evidence you have as to why he didn't want to

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   talk about it?

2   A.   Harris made a comment about it not being the right place

3   at that time to discuss that.

4   Q.   All right.  There were quite a number of people at that

5   training session, correct?  Other than people who are in this

6   room?

7   A.   Yes, that's correct.

8   Q.   Did they talk about -- did this group talk about it

9   afterwards on an encrypted chat-messaging service?

10   A.   Yes, they did.

11   Q.   Have you run across that -- I want to just talk about that

12   for a moment.  Have you run across encrypted messaging services

13   a fair amount in your job doing counter-intelligence and

14   counter-terrorism?

15   A.   Yes, I have.

16   Q.   What kind of groups use that?

17   A.   Terrorist organizations.  Also foreign intelligence

18   agencies utilize them.  Or generally criminal groups that are

19   trying to not be detected by law enforcement.

20   Q.   And what is it about some of these applications that makes

21   it so hard to actually monitor them?

22   A.   Most of them are maintained by foreign entities and they

23   are encrypted from point to point, so unless we have the

24   encryption key or password to access, we have trouble getting

25   into those chats.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1  *Q.*  Okay.  So they are encrypted.  And like you said, foreign

2  entities you can't serve a subpoena on them or anything like

3  that.

4  *A.*  That's correct.

5  *Q.*  Now, with some of these encrypted apps, even the ones that

6  are here in America, if you try to serve a subpoena on them or

7  something like that, they will tell you they can't even break

8  into it themselves, correct?

9  *A.*  That's correct.

10  *Q.*  Is that what you mean by end-to-end encryption?

11  *A.*  That's correct.

12  *Q.*  Okay.  Did this group start using chat applications that

13  were end-to-end encrypted?

14  *A.*  Yes, they did.

15  *Q.*  There was one of them you became familiar with called

16  Wire, correct?

17  *A.*  Correct.

18  *Q.*  That's commercially available?

19  *A.*  Yes, it is.

20  *Q.*  All right.  I want to pull up Exhibit 3.

21       *MR. KESSLER:*  Do you want to take a moment to put the

22  lights down?

23       *THE COURT:*  Sure, let's do that.

24       *MR. KESSLER:*  And let me offer 2 into evidence -- I

25  forgot -- unless there's any objection.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1           THE COURT:  Any objection to Exhibit 2?

2           MR. GRAHAM:  No, Your Honor.

3           MR. HILLS:  No, Your Honor.

4           MR. DOUGLAS:  No, Your Honor.

5           MS. NIEUWENHUIS:  No, Your Honor.

6           THE COURT:  All right.  It's admitted.

7           MR. KESSLER:  I'm going to bring up 3 for

8    identification.  I may have to -- can you see it on your

9    screen?  It's a little fuzzier here than it is down here.

10          THE COURT:  I can see it on my screen.  I don't know

11   how well Mr. Graham can see it.

12          MR. GRAHAM:  I can't see it.

13          THE COURT:  Do you have a physical copy?

14          MR. KESSLER:  I'm going to blow it up.  I just know

15   that it's fuzzier up there than it is on all the small

16   monitors.

17   Q.   (BY MR. KESSLER)  So did they actually use sort of

18   monikers or code names when they were talking on this encrypted

19   app?

20   A.   Yes, they did.

21   Q.   Okay.  I'm going to blow up a couple things.  At the very

22   top of it -- I apologize for the language, Your Honor -- but it

23   says "Fuck Around Find Out."  Was that the name of their chat

24   group?

25   A.   Yes, that is.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   Q.   Okay.  And let me just blow one of these up here.  You can

2   see that at the top here in blue it has the name of who is

3   speaking.  So did you become aware through talking to the

4   informant and reviewing other evidence of who the different

5   monikers are, who they referred to?

6   A.   Yes.

7   Q.   Who is Beaker?

8   A.   That would be Harris.

9   Q.   Daniel Harris?

10  A.   Yes, that's correct.

11  Q.   Okay.

12          THE COURT:  Mr. Graham and Mr. Douglas, are you able

13  to see okay?

14          MR. GRAHAM:  Yes, Your Honor.

15          MR. DOUGLAS:  Yes, Your Honor.

16          THE COURT:  Thank you.

17  Q.   (BY MR. KESSLER)  Can you read what he suggested in their

18  encrypted app right after their last meeting?

19  A.   Yep.  "Laying in bed.  Craziest idea.  Have one person go

20  to her house, knock on the door, and when she answers it just

21  cap her.  At this point fuck it."

22  Q.   Okay.  I'm going to blow up one more here.  What does this

23  one say?  This is Mr. Harris as well?

24  A.   Yes, it is.

25  Q.   And what did he say?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   A.   "I mean, fuck, catch her walking into the building and act

2   like a passers-by and fixing dome her, then yourself, whoever

3   does it."

4   Q.   I'm not familiar with the term "dome her," but it possibly

5   meant do her or something like that?

6   A.   That's correct.

7   Q.   Okay.  And there's one more down here at the bottom.  Also

8   Beaker, Mr. Harris.  Now, before we read the whole thing, it

9   starts with "Or just mug the pizza guy and take his shirt."

10        There was a federal judge recently whose son was shot,

11   correct?

12   A.   That's correct.

13   Q.   By somebody who posed as a delivery man at the front door?

14   A.   That's correct.

15   Q.   Okay.  And this message was after that?

16   A.   Yes.

17   Q.   So what's the suggestion here?

18   A.   To pose as the pizza guy and when she answers the

19   door . . .

20   Q.   Okay.  "And just take a pistol and like three rounds."  Is

21   that what it says?

22   A.   Yes.

23   Q.   Okay.  All right.  So Mr. Franks was also there at this

24   August 9th training session in Munith, correct?

25   A.   That's correct.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   Q.   Where they discussed the kidnapping.  And then he was also

2   a part of this I'll call it FAFO for Fuck Around Find Out, this

3   FAFO chat group?

4   A.   That's correct.

5   Q.   All right.  Let me bring up --

6        MR. KESSLER:  I'm going to offer Exhibit 3.

7        MR. GRAHAM:  No objection.

8        MR. HILLS:  No objection.

9        MS. NIEUWENHUIS:  No, Your Honor.

10       MR. KESSLER:  Let's bring up 4 for identification.

11       THE COURT:  It's admitted.

12  Q.   (BY MR. KESSLER)  Now, who is Red Hot?

13  A.   Red Hot would be Franks.

14  Q.   Okay.  And he says what?

15  A.   "Okay, sounds good.  I'm up for anything as long as it's

16  well-planned."

17       MR. KESSLER:  Okay.  Offer Number 4.

18       THE COURT:  Any objection?

19       MR. HILLS:  No objection.

20       MR. GRAHAM:  No objection.

21       MR. DOUGLAS:  No, Your Honor.

22       MS. NIEUWENHUIS:  No.

23       THE COURT:  It's admitted.

24  Q.   (BY MR. KESSLER)  Now, they have talked a little bit on

25  here, but did they also share videos with each other from time

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    to time?

2    *A.*    Yes, that's frequently.

3    *Q.*    So you can share -- you can do voice calls on this

4    encrypted platform, you can share videos, you can share audio

5    recordings and all of that, correct?

6    *A.*    That's correct.

7    *Q.*    Okay.  Now, we mentioned that they use encryption to keep

8    you from looking in it and they use these code names just in

9    case.  Do they also use code words --

10   *A.*    Yes.

11   *Q.*    -- to describe what they are talking about?  And that's

12   just to throw you off in case somebody does have a chance to

13   see what's inside?

14   *A.*    That's correct.

15   *Q.*    On July 24th did Mr. Fox say something about make a cake

16   and send it?

17   *A.*    That's correct.

18   *Q.*    And from his in-person discussions with Mr. Fox, what did

19   the confidential informant tell you the group understood that

20   to mean?

21   *A.*    Making an explosive and sending it.

22   *Q.*    Okay.  And on July 26th did Mr. Fox say he hadn't heard

23   from the baker?

24   *A.*    That's correct.

25   *Q.*    And what would a baker be in their code language?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   A.   It would be the explosives person or the expert.

2   Q.   Okay.  Mr. Fox also said on that day maybe they should

3   send out some cupcakes.  What would that mean?

4   A.   Same as the cake, to make some sort of explosive or some

5   device and send it.

6   Q.   Okay.  Now we'll get to this a little later, but on

7   October 17th all these gentlemen were all arrested, correct?

8   A.   October 7th.

9   Q.   I'm sorry, October 7th.  And FBI actually interviewed

10  Mr. Harris, right?

11  A.   Yes.

12  Q.   And did he confirm that that's what the group understood

13  the meaning of "baker" and "cakes" and "cupcakes" to be,

14  explosives?

15  A.   Yes, he did.

16  Q.   Now, you mentioned that they sent each other videos where

17  they could see weaponry.  I'm going to bring up Exhibit 5 for

18  identification.  As a matter of fact, I'm going to --

19       MR. KESSLER:  Bear with me one second, Your Honor.

20  These work better if I pull them up straight from here.

21       Okay.  Exhibit 5 is a video of Mr. Franks.

22   *(Video playing)*

23       MR. KESSLER:  And we'll talk about the meaning in a

24  second.  I would offer Number 5.

25       THE COURT:  Any objection?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1      *MR. GRAHAM:*  No objection.

2      *MR. HILLS:*  No.

3      *MR. DOUGLAS:*  No, Your Honor.

4      *MS. NIEUWENHUIS:*  No objection.

5      *THE COURT:*  It's admitted.

6      *MR. KESSLER:*  Let me bring up Number 6.

7      *(Video playing)*

8  *Q.*   *(BY MR. KESSLER)*  That's Mr. Fox in the basement of the

9  vacuum cleaner shop, correct?

10  *A.*   Yes, that's correct.

11      *MR. KESSLER:*  I would move 6 into evidence,

12  Your Honor.

13      *THE COURT:*  Any objection?

14      *MR. DOUGLAS:*  No objection.

15      *MR. KESSLER:*  All right.  So I noticed that --

16      *THE COURT:*  Hang on a second, Mr. Kessler.  Hearing

17  no objections, it's admitted.

18      *MR. KESSLER:*  Thank you, Your Honor.

19  *Q.*   *(BY MR. KESSLER)*  So we notice in those videos that they

20  are sharing with each other they seem to be practicing speed

21  reloading.  Is that right?

22  *A.*   That's correct.

23  *Q.*   And why would that be important in a tactical situation?

24  *A.*   To minimize the time that your weapon is inoperable.

25  *Q.*   Okay.  In case you were in a gunfight, right?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1  A.    That's correct.

2  Q.    Okay.  Let me bring up -- let me go back here.

3        Now, on the same encrypted chat where the -- message

4  service where they shared those other videos they also shared

5  pictures, correct?

6  A.    That's correct.

7  Q.    And this one -- we saw the names before.  Let me just blow

8  up the name here.  This one is from Gunny.  Who is Gunny?

9  A.    That would be Ty Garbin.

10 Q.    Ty Garbin.  Okay.  And is there anything significant about

11 this picture here of this firearm that he's sharing with the

12 group?

13 A.    Yeah.  The weapon appears to be a short-barreled rifle

14 with a silencer attached.

15 Q.    Now, when you say short-barreled rifle, that has a

16 specific meaning, right?

17 A.    Yes, that's correct.

18 Q.    All right.  And under ATF regulations and under federal

19 law a rifle with a shorter barrel than I believe it's

20 18 inches, but a short-barreled rifle like this is illegal,

21 correct?

22 A.    That's correct.

23 Q.    And the thing at the end of the barrel is not part of the

24 barrel, is it?

25 A.    That's not correct.  Or, I'm sorry, that's correct.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    Q.  All right.  That's actually also a silencer, isn't it?

2    A.  Yes.

3    Q.  Okay.

4             MR. KESSLER:  Let me just offer 7 into evidence,

5    Your Honor.

6             THE COURT:  Any objection?

7             MR. GRAHAM:  No.

8             MR. DOUGLAS:  No, Your Honor.

9             MS. NIEUWENHUIS:  No, Your Honor.

10            MR. HILLS:  None.

11            MR. SPRINGSTEAD:  I would object, Your Honor.  I'm

12   not sure that that's actually Mr. Garbin's weapon.  He may have

13   posted a picture of it, but I don't have any indication that

14   it's actually something that he had in his possession.

15            THE COURT:  Well, I think that goes to weight and not

16   admissibility, but then it's admitted.

17            MR. KESSLER:  I think Exhibit 8 may answer that.

18   Q.  (BY MR. KESSLER)  Do you -- Agent Trask, did Mr. Garbin

19   also share a video of his whole gun locker in his house?

20   A.  That's correct, on Snapchat.

21   Q.  Okay.  And we're going to play that video in a second, but

22   you'll see this gun as they pan through his basement, correct?

23   A.  That's correct.

24   Q.  Which was also searched on October 7th?

25   A.  That's correct.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    *Q.*   And that was Mr. Garbin's basement?

2    *A.*   Yes, that was.

3    *Q.*   All right.  Let's play 8, then.  And I apologize if it's a

4    little loud.  There's some music that's with it.  The music is

5    not -- was not put in by FBI, correct?

6    *A.*   No.

7    *Q.*   That's Mr. Garbin's music that he put to the video?

8    *A.*   That's correct.

9    *Q.*   Okay.

10    *(Video playing)*

11    All right.  Now, we saw the short-barreled rifle as part

12    of him panning through that.  We saw a number of guns in his

13    locker here.  Did he also post a picture --

14    *MR. KESSLER:*  I'm sorry, let me move 8 into evidence

15    before I forget.

16    *THE COURT:*  Any objection?

17    *MR. GRAHAM:*  No.

18    *MR. HILLS:*  No.

19    *MR. DOUGLAS:*  No, Your Honor.

20    *THE COURT:*  It's admitted.

21    *Q.*   *(BY MR. KESSLER)*  Did he also bring up -- or did he also

22    share a picture of another gun he has with a suppressor?

23    *A.*   That's correct.

24    *Q.*   Let me bring up Exhibit 9.  Is that the gun?

25    *A.*   Yes, it is.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   Q.   Okay.  And this part right down here at the bottom -- let

2   me just point out a couple of features on this gun.  So at the

3   bottom we see something wrapped in camouflage.  Is that a

4   suppressor?

5   A.   That is correct.

6   Q.   And what is that that's attached to the underside of the

7   rifle just behind the suppressor?

8   A.   That would be a tripod.

9   Q.   All right.  That's something that folds down so that you

10  can actually rest the gun on the ground?

11  A.   That's correct.  It creates a more stable base.

12  Q.   And then it's got it looks like a large rifle scope at the

13  top?

14  A.   That's correct.

15  Q.   So this is outfitted -- like what kind of person would use

16  this type of weapon in the military?

17  A.   Typically it would be a sniper rifle.

18  Q.   Okay.  All right.  So let's move forward to August 18th.

19  We've been talking about them using an encrypted chat group.

20  They changed the names from time to time, correct?

21  A.   That's correct.

22  Q.   So we have the FAFO group.  Did they call it The Bonfire

23  Party at some point?

24  A.   That's correct.

25  Q.   So let's bring up what I've marked as Exhibit 10.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1          *MR. KESSLER:*  I'll move 9 into evidence first.

2          *THE COURT:*  Any objection?

3          *MR. HILLS:*  No objection.

4       *MR. GRAHAM:*  No.

5          *THE COURT:*  It's admitted.

6          *MR. KESSLER:*  Let's bring up 10.  And I'll blow up

7    the relevant parts here that we have highlighted.

8    *Q.*   *(BY MR. KESSLER)*  Now, this guy, Doc -- whoops, sorry --

9    we have somebody named Doc.  This is not one of the individuals

10   in this courtroom today, right?

11   *A.*   That's correct.

12   *Q.*   That's a member of -- former member of the

13   Wolverine Watchmen who has moved out-of-state?

14   *A.*   Correct.

15   *Q.*   All right.  When he moved out-of-state he left some things

16   behind in his apartment, right?

17   *A.*   Yes.

18   *Q.*   And did that cause a general panic among the members of

19   the group?

20   *A.*   Yes.

21   *Q.*   All right.  Let's investigate that here in their

22   discussions.  So can you read what it says here?

23   *A.*   "Guys, the cops just questioned my old roommate about me.

24   Apparently they were asking him about my military pictures and

25   my actions in the Boogaloo Movement.  Has anyone else had

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   anything strange going on?  I see it looks like they got to

2   Gunny too."

3   Q.   And just to keep it short, what exactly is the

4   Boogaloo Movement?

5   A.   It's a movement that essentially -- I don't want to mess

6   it up exactly, so --

7   Q.   Is it an antigovernment sentiment --

8   A.   Yes.

9   Q.   -- basically about overthrowing the government?

10  A.   Yes, that's correct.

11  Q.   Okay.  All right.  And then Gunny, who is Mr. Garbin,

12  reassures the group that it wasn't his -- it wasn't him that

13  got Doc in trouble over the boogaloo, correct?

14  A.   That's correct.

15  Q.   Now, he says "My S is unrelated.  They approved my stamp

16  submission and I bought a gun like a month ago."

17       So what's a stamp?  What would he be referring to?

18  A.   That would be registering a -- something like an automatic

19  rifle or a suppressor.

20  Q.   Okay.  So you can possess certain things like a

21  suppressor, like you mentioned a fully automatic rifle or

22  short-barreled rifle, if you make an application to the ATF and

23  they approve your license for that, right?

24  A.   That's correct.

25  Q.   Okay.  So those silencers, you'd have to have a stamp for

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    that?

2    A.   That's correct.

3    Q.   Okay.  Now, just as an aside, Mr. Garbin did have a stamp

4    for one silencer, correct?

5    A.   That's correct.

6    Q.   You've searched -- or ATF has searched that through their

7    records?

8    A.   That's correct.

9    Q.   He had more than one, correct?

10   A.   Yes.

11   Q.   And the others were not registered to your knowledge?

12   A.   That's correct.

13   Q.   Okay.  Let's take a look at the next part of this.

14        So Doc is saying -- Doc immediately tells everybody

15   "Change your code words ASAP," right?

16   A.   Correct.

17   Q.   Okay.  And says "We've been compromised it appears."

18   A.   Correct.

19   Q.   Okay.  Now we're going to get into some of the people who

20   were in this room.  Red Hot again is Mr. Franks, right?

21   A.   That's correct.

22   Q.   So he was concerned about it.  What did he say?

23   A.   "Either Wire is compromised or someone who knew about the

24   codes said something that got around."

25   Q.   And what was his biggest concern according to this line

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1  here?

2  *A.*   Somebody was asking him "Do you think we have a fed?"

3  *Q.*   So the group was concerned about being infiltrated by

4  federal law enforcement?

5  *A.*   That's correct.

6  *Q.*   Okay.  And he's saying "How else would they know about

7  coded language?  It's very specific information to have and

8  we've only discussed it within this group."  Right?

9  *A.*   That's correct.

10  *Q.*   So according to the informant the group was very careful

11  not to spread their identities or anything outside of their

12  group.

13  *A.*   That's correct.

14  *Q.*   And Mr. Frank suggested doing what?

15  *A.*   In-person talks only.

16  *Q.*   So he didn't want to talk anymore at all over Wire.

17  At least until they changed something, right?

18  *A.*   That's correct.

19  *Q.*   Now, Mr. Garbin was worried that feds or somebody might

20  have done what?

21  *A.*   That they had gotten screen shots of their text strings.

22  *Q.*   Okay.  And this Doc individual who has left the state was

23  actually concerned that maybe somebody was -- feds were

24  listening to them over their phones?

25  *A.*   That's correct.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1  Q.   And that's what he refers to as possibly a tinfoil hat

2  idea?

3  A.   Yes.

4  Q.   Mr. Franks tried to assure them about what?

5  A.   That the local PD wouldn't have access and it would have

6  been turned over to the feds.

7  Q.   Okay.  Now, who is Wayward?  He's changed names a few

8  times.  I'm sorry, go ahead.  Who would Wayward be?

9  A.   I don't recall offhand.

10  Q.   The advice?

11  A.   That "You need to tighten our shit up and get your shit

12  together.  Doing things like forgetting pictures and leaving BS

13  laying around is retarded."  And, yeah, he's pissed off because

14  they believe they have a mole in their -- in their -- our unit

15  or guys are being stupid.

16  Q.   Okay.  So they were worried about having a mole?

17  A.   That's correct.

18  Q.   Did they in fact have what they referred to as a mole?

19  A.   Yes, they did.

20  Q.   They did have an informant in their group.  And that's how

21  you were able to see these messages even though they were

22  end-to-end encrypted, right?

23  A.   That's correct.

24  Q.   Okay.  So -- now, this person is not in this room either.

25  Somebody who is going by the moniker of Gerald.  But did the

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    group decide that they needed to try and figure out who is who

2    in their group?

3    A.   Yes, they did.

4    Q.   All right.  So he suggests everybody get your stories

5    square and dig into everybody and confirm without a doubt

6    people's identity.  So we'll get into that in a moment what

7    they did to do that.

8         Did they plan to meet in person to confirm who everybody

9    really was?

10   A.   Yes, they did.

11   Q.   There's a message here from Beaker.  And again Beaker is

12   Mr. Harris, right?

13   A.   That's correct.

14   Q.   And what did he suggest?

15   A.   He suggests meeting at his house and until then stay off

16   the Wire chat.

17   Q.   Okay.  What kind of things -- well, here we go.

18        Is Wayward Mr. Fox?

19             DEFENDANT FOX:  I'm not even that shit.

20   Q.   (BY MR. KESSLER)  I wasn't asking Mr. Fox, but he says

21   he's not.

22   A.   No.  No, that is not.

23   Q.   Whoever Wayward was, he suggested bringing pay stubs to

24   prove who their identity is, right?

25   A.   That's correct.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   Q.   Okay.  And then Gunny, that's Mr. Garbin, agrees?

2   A.   That's correct.

3   Q.   And then Red Hot, Mr. Franks, also agrees, correct?

4   A.   That's correct.

5   Q.   And they talk about bringing three forms of identification

6   at a minimum.  Social Security card, pay stubs, IDs, prior

7   military identification.  Right?

8   A.   That's correct.

9   Q.   Okay.  Now, they revisit this again later.  They are

10  obviously -- it seems like they are worried about it.

11       So we have Mr. Franks says "If it's true, something is

12  compromised and it's got to be vetted or shut down.  And we

13  should only operate in our small unit."  That's this unit from

14  then on forward, correct?

15  A.   That's correct.

16  Q.   All right.  And they talked about everyone in the group --

17  this is Beaker, that would be Mr. Harris -- says "Everyone in

18  the group stay off the app until we come up with a date and a

19  place"?

20  A.   That's correct.

21  Q.   Okay.  Now, they are not just worried about the code

22  words, are they?  Mr. Franks, what is he worried about?

23  A.   Mr. Franks is worried about them having their faces or

24  other identifying information such as their names.

25  Q.   And that will come up again later that the group wants to

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   avoid public scrutiny, right?

2   *A.*   That's correct.

3   *Q.*   They don't want their faces seen in public.

4        Okay.  And then Beaker, that's Mr. Harris, urges the group

5   to get off of Wire.  That's this chat, right?

6   *A.*   That's correct.

7   *Q.*   This particular encrypted message group.  And get off it

8   by tomorrow.

9   *A.*   That's correct.

10  *Q.*   Okay.  And they did switch applications, didn't they?

11  *A.*   Yes, they did.

12  *Q.*   FBI was still able to see everything they talked about on

13  their new application because they included the informant in

14  their group, right?

15  *A.*   That's correct.

16          *MR. KESSLER:*  Okay.  I would move 10 into evidence,

17  Your Honor.

18          *THE COURT:*  Any objection?

19          *MR. GRAHAM:*  No, Your Honor.

20          *MR. DOUGLAS:*  No, Your Honor.

21          *MR. HILLS:*  No objection.

22          *THE COURT:*  It's admitted.

23  *Q.*   *(BY MR. KESSLER)*  Let's take a look at 11 for

24  identification.  So this is their new one, correct?

25  *A.*   That's correct.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    *Q.*    And what is Threema.Web?

2    *A.*    Threema is a web app similar to the Wire that they were

3  using previously.  It's an encrypted chat.

4    *Q.*    It's just a different service?

5    *A.*    Yes, it is.

6    *Q.*    Now they renamed their group again.  It looks like they

7  call themselves The Boys here; is that right?

8    *A.*    That's correct.

9    *Q.*    And then looking at some of the people who were members of

10  that group.  We have Beaker.  You can see that one there?

11    *A.*    That's correct.

12    *Q.*    Me would be the informant, right?

13    *A.*    Yes.

14    *Q.*    Okay.  And we've got Debased Tyrant.  That's the first

15  time we're seeing that moniker.  Who is Debased Tyrant?

16    *A.*    That would be Mr. Caserta.

17    *Q.*    Okay.  And then they added a few more people.  It says

18  Beaker is added to the group.  Group renamed to The Boys.  And

19  let's go on down here.  Now, Beaker, Mr. Harris, actually

20  explains the best thing about this particular application to

21  the other members, right?  Can you read that?

22    *A.*    "The nice thing with this app is with the click of a

23  button you can empty everything out, and if the feds try and

24  see what you or anyone said, they can't find anything."

25    *Q.*    So they liked the ability to erase it instantly so law

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    enforcement couldn't see it?

2    A.   That's correct.

3    Q.   Okay.

4         MR. KESSLER:  I would move this one into evidence,

5    Your Honor, as Number 11.

6         THE COURT:  Any objection?

7         MR. GRAHAM:  No, Your Honor.

8         MR. HILLS:  No objection.

9         MR. SPRINGSTEAD:  No.

10        MS. NIEUWENHUIS:  No.

11        THE COURT:  It's admitted.

12   Q.   (BY MR. KESSLER)  All right.  So let's move forward to

13   August 29th.  Did they start actually doing some active stuff

14   besides just talking on encrypted chats?

15   A.   Yes, they did.

16   Q.   All right.  So Mr. Fox over here at my right and the

17   informant and another individual went up north, didn't they?

18   A.   That's correct.

19   Q.   What was the purpose of that trip?

20   A.   To conduct surveillance on the governor's vacation home.

21   Q.   Okay.  Let's take a look at -- I don't know if I moved

22   it in.  I did move 11 in.

23        Let's take a look at Exhibit 12.  So the informant was

24   actually there with Mr. Fox, correct?

25   A.   That's correct.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    Q.   And did the informant take this picture?

2    A.   Yes, he did.

3    Q.   What is Mr. Fox doing in this picture?

4    A.   Taking photographs of the lake area.

5    Q.   All right.  This is the lake on which the governor has her

6    vacation home?

7    A.   That's correct.

8    Q.   As I mentioned we're not going to mention the name of the

9    lake.  It's pretty nondescript from here.  Is this from the

10   other side of the lake?

11   A.   That's correct.

12   Q.   Okay.  They actually looked right by her house as well,

13   right?

14   A.   Correct.

15   Q.   Okay.  Now, after --

16        *MR. KESSLER:*  I would move 12 into evidence,

17   Your Honor.

18        *THE COURT:*  Any objection?

19        *MS. NIEUWENHUIS:*  No objection.

20        *MR. HILLS:*  None.

21        *MR. DOUGLAS:*  No objection.

22        *THE COURT:*  It's admitted.

23   Q.   *(BY MR. KESSLER)*  After going around the lake and taking

24   pictures they stopped for lunch, right?

25   A.   Correct.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   Q.   Let's bring up 13.  And what's this picture of?

2   A.   That would be Adam Fox creating a hand-drawn map of the

3   area.

4   Q.   Around the lake?

5   A.   Denoting where the house is and other things.

6   Q.   Okay.  Now, I'm going to show the hand-drawn map in a

7   moment.  Did he also talk about doing laminated maps or

8   anything else for tactical purposes?

9   A.   That's correct, he did.

10  Q.   All right.  And what would be the purpose of laminating a

11  map?

12  A.   Planning purposes.  You can draw out lines with dry-erase

13  to make changes if you need to.

14  Q.   Okay.  So let's take a look at this one, the handwritten

15  one.  We can see him drawing it here.

16          MR. KESSLER:  I would offer this one into evidence.

17  That's 13, Your Honor.

18          THE COURT:  Any objection?

19          MR. GRAHAM:  No, Your Honor.

20          MR. DOUGLAS:  No, Your Honor.

21          MR. HILLS:  No.

22          MS. NIEUWENHUIS:  No, Your Honor.

23          THE COURT:  It's admitted.

24  Q.   (BY MR. KESSLER)  And I'll bring up 14.  We have some

25  things redacted here that actually are the names of places that

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    would identify where the house is.  But is that a map of -- is

2    that the actual map that he was drawing in that last picture?

3    A.   That's correct.

4    Q.   I want to focus your attention in particular on a couple

5    things.

6         First, this in the circle, was that identifying the

7    highway that went there?

8    A.   Yes, it was.

9    Q.   And that becomes important later, correct, for tactical

10   purposes --

11   A.   That's correct.

12   Q.   -- in their discussions?

13        Down here it says "PD" right here.  And the thing that's

14   blocked off actually is the name of a town police department,

15   correct?

16   A.   That's correct.

17   Q.   Is that the town police department that's closest to the

18   governor's home?

19   A.   Yes, it is.

20   Q.   And what does it say under here?  It looks like it says

21   "Three miles, 2.5 minutes."

22   A.   That is the nearest station and the estimated response

23   time to the governor's property.

24   Q.   All right.  Was it that third person who actually figured

25   out how long it would take?

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   A.   Yes, it is.  Yep.

2   Q.   But Mr. Fox was the one who wrote it down on his map?

3   A.   That's correct.

4   Q.   And then it says here "Everything else 20-plus miles out."

5   By everything else are we talking about other law enforcement?

6   A.   Yes, to include Michigan State Police.

7   Q.   Okay.  So they were trying to figure out how long it would

8   take for law enforcement to respond if they did something at

9   the vacation home, right?

10  A.   That's correct.

11          MR. KESSLER:  I'll now offer 14 into evidence.

12          THE COURT:  Any objection?

13          MR. HILLS:  None.

14          MR. DOUGLAS:  No, Your Honor.

15          MS. NIEUWENHUIS:  No, Your Honor.

16          THE COURT:  It's admitted.

17  Q.   (BY MR. KESSLER)  So Agent Trask, a moment ago we

18  discussed that -- we saw the picture of him taking pictures

19  from the other side of the lake.  They also went right up close

20  to the house, right?

21  A.   That's correct.

22  Q.   And did Mr. Fox post pictures and video from that

23  surveillance to the encrypted chat group?

24  A.   Yes, he did.

25  Q.   I'm going to bring up Exhibit 15 for identification.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1          All right.  And again I've blocked out where -- the house

2     is distinctive, so I've blocked out what the house looks like

3     just to protect the governor's privacy.

4          Are these pictures here that he sent -- oh, first off.

5     The name.  They changed names again on this group.  Alpha Fuck

6     You.  That one shows up a lot from here on out, correct?

7     A.   Yes, it does.

8     Q.   And whose name is that on the encrypted chat group?

9     A.   That would be Adam Fox.

10    Q.   Adam Fox?  Okay.  So he is posting these for the group.

11    And this is shot from the window of the car?

12    A.   That's correct.

13    Q.   Okay.  And he posted quite a few pictures as they drove

14    by, right?

15    A.   Correct.

16    Q.   Okay.  And then this one has got the little arrow in the

17    middle.  And he says "We have two videos."  So that one is a

18    video, right?

19    A.   That's correct.

20    Q.   Have you seen that video?

21    A.   I have.

22    Q.   So they actually drove by slowly video recording the

23    house?

24    A.   That's correct.

25              *MR. KESSLER:*  Okay.  I would move 15 into evidence.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1      THE COURT:  Any objection?

2      MR. GRAHAM:  No.

3      MR. DOUGLAS:  No, Your Honor.

4      MS. NIEUWENHUIS:  No, Your Honor.

5      THE COURT:  It's admitted.

6   Q.   (BY MR. KESSLER)  And then they chatted about these on

7   their encrypted chat group, correct?

8   A.   That's correct.

9   Q.   Let me bring up Exhibit 16 for identification.

10       So this one I've blacked out his phone number for privacy,

11   but when it says "Ty," that's Mr. Garbin, correct?

12   A.   That's correct.

13   Q.   All right.  So he actually chatted with the informant

14   about the pictures that they saw, right?

15   A.   Correct.

16   Q.   So the question was "How was the road trip?"  And the

17   response was "Got eyes on the house."  That's what this emoji

18   thing is here?

19   A.   That's correct.

20   Q.   Okay.  And he's got also another emoji down here with

21   scissors.  Can you sort of try and just explain what that is

22   and how you read that?

23   A.   The interpretation would be if you can cut off police at

24   the bridge, delay the response.

25   Q.   Okay.  So when we were looking at that hand-drawn map and

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   we mentioned that there was a highway passing along there,

2   there's a bridge on that highway, correct?

3   A.   That's correct.

4   Q.   And the group understood if you can cut the police off at

5   that bridge, it would make it even longer for the local police

6   department to respond?

7   A.   That's correct.

8   Q.   All right.  And let's take a look at the next page.  I've

9   blacked out the map because you could see the area near the

10   governor's house.  Let's bring up this part here.  So this one

11   with emojis says what?

12   A.   Essentially is saying if the bridge went down it would

13   also stop the response.

14   Q.   It looks like stop the wave.

15   A.   Yep.  Assuming a police wave or the response.

16   Q.   Okay.  And what else -- we saw that it was on -- that

17   Mr. Fox was taking pictures from across the lake.  So what else

18   did Mr. Garbin offer to do?

19   A.   Mr. Garbin offered to paint his boat black for night,

20   night fishing, or part of the plan.

21   Q.   Okay.  And again you've mentioned about coded language.

22   He talks about painting his boat black for night fishing as

23   well.

24   A.   That's correct.

25   Q.   Did they anywhere else in any of these chats talk about

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    fishing?

2    A.   No.

3    Q.   All right.  Just like they weren't talking about baking in

4    any of the other chats.  So this is code?

5    A.   That's correct.

6    Q.   Okay.

7              MR. KESSLER:  And I move 16 into evidence,

8    Your Honor.

9              MR. GRAHAM:  No objection.

10             MR. HILLS:  No objection.

11             THE COURT:  It's admitted.

12   Q.   (BY MR. KESSLER)  All right.  One last thing before I move

13   away from this one.  What we have redacted here, that looks

14   like a Google Map that had been posted into the chat.  Does

15   that actually show the bridge that they were talking about

16   taking down?

17   A.   That's correct.

18   Q.   Okay.  So let's move forward to September 12th and 13th.

19   Did they have another FTX or field training exercise that

20   weekend?

21   A.   That's correct.

22   Q.   Where was that one conducted?

23   A.   That was located on Ty Garbin's property up in Luther,

24   Michigan.

25   Q.   All right.  And as it turns out -- Ty Garbin obviously had

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   the ability to invite people there.  Does he own it?

2   A.   Um, we believe it's under a land contract currently.

3   Q.   So he's buying it from someone else on a land contract?

4   A.   That's correct.

5   Q.   Okay.  And was that field training exercise attended by

6   all the people -- all the defendants here in this room --

7   A.   Yes.

8   Q.   -- in addition to other people?

9        Okay.  So they came from Michigan.  Did Mr. Croft who is

10  not here today attend that one?

11  A.   Yes, he did.

12  Q.   So he came all the way from Delaware to attend that?

13  A.   That's correct.

14  Q.   All right.  And they conducted more specific training this

15  time?

16  A.   Yes, they did.

17  Q.   Okay.  Now, you're aware of the nature of the training

18  they did from talking to the informant, right?

19  A.   That's correct.

20  Q.   Now, there was more than one informant by this point,

21  right?

22  A.   Absolutely.

23  Q.   All right.  So had FBI introduced other people to the

24  group at this point?

25  A.   By this point, yes.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   *Q.*   What's a UCE?

2   *A.*   It's an undercover employee.

3   *Q.*   So that would refer to potentially an FBI undercover

4   agent?

5   *A.*   That's correct.

6   *Q.*   Did the FBI introduce a particular UCE to this group who

7   went by the name of Red?

8   *A.*   That's correct.

9   *Q.*   And what was he introduced to the group as?

10  *A.*   He was the explosives or demo guy.

11  *Q.*   Okay.  When you say "demo guy," short for demolition?

12  *A.*   Yes, that's correct.

13  *Q.*   Had Mr. Fox talked about needing to recruit a demolition

14  guy for their mission?

15  *A.*   Yes, he did.

16  *Q.*   All right.  So this undercover agent, Red, was introduced

17  as that explosives expert, correct?

18  *A.*   That's correct.

19  *Q.*   By the informant?  He vouched for him?

20  *A.*   That's correct.

21  *Q.*   So he was there for this as well.  Did they do the usual

22  firearms training?

23  *A.*   Yes, they did.

24  *Q.*   Now, they also trained something called breaching,

25  correct?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1  *A.*    Correct.

2  *Q.*    You do that in the FBI, right?  What is breaching?

3  *A.*    It's breaching a doorway, a threshold.  It's a dynamic

4  entry essentially to gain access to that room or that residence

5  or building.

6  *Q.*    Okay.  When you say "a dynamic entry," we're talking about

7  like what we see on TV where a SWAT team batters down the door

8  and runs into a house?

9  *A.*    That's correct.

10  *Q.*    Did they also train on clearing a house?

11  *A.*    That's correct.

12  *Q.*    What's clearing to the FBI?

13  *A.*    Room clearing is going in tactically to ensure that a room

14  is safe and secure and there are no threats in the room.

15  *Q.*    Okay.  And that's not something you need to do for

16  sporting purposes or anything, right?

17  *A.*    Correct.

18  *Q.*    Okay.  Did they also do anything with explosives at this

19  FTX as well?

20  *A.*    Yes, they did.

21  *Q.*    Now, Mr. Croft, who isn't here with us, did he bring

22  materials for an improvised explosive device?

23  *A.*    Yes, he did.

24  *Q.*    All right.  Is that what he called his chemistry set?

25  *A.*    That's correct.

1   *Q.*   All right.  What did he bring?

2   *A.*   There were shrapnel, black powder, balloons, to create

3   what he -- the IED.

4   *Q.*   Okay.  Now, at some point during this meeting -- really

5   the training was September -- some people arrived a little

6   early -- but September 12th to the 13th, correct?

7   *A.*   That's correct.

8   *Q.*   Were Mr. Croft, Garbin, Franks, and Caserta all there?

9   *A.*   Yes, they were.

10  *Q.*   Okay.  And were they all recruited by Mr. Fox for

11  something in particular?

12  *A.*   Yes.

13  *Q.*   As was the informant and Red, the FBI agent?

14  *A.*   That's correct.

15  *Q.*   What did Mr. Fox recruit them all to do?

16  *A.*   To do a nighttime surveillance of the governor's vacation

17  home.

18  *Q.*   With what purpose?  Did he tell them what it was for?

19  *A.*   To plan for the kidnapping of the governor.

20  *Q.*   So all told we had the people here, Mr. Croft, Garbin,

21  Franks, and Caserta, two CHSs at this point now, right?

22  *A.*   That's correct.

23  *Q.*   And two FBI undercovers?

24  *A.*   That's correct.

25  *Q.*   Okay.  Now, you mentioned that they were going to go do a

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   surveillance that night.  Did they actually do that?

2   A.   Yes, they did.

3   Q.   And Mr. Caserta stayed back at the camp, right?

4   A.   Correct.

5   Q.   The rest of them -- Mr. Fox, Croft, Garbin, and Franks --

6   all went up there in three separate cars, right?

7   A.   Correct.

8   Q.   Did they stop between Luther, Michigan, and the governor's

9   vacation home?

10  A.   One vehicle stopped near the bridges.

11  Q.   Let's get to that in a moment.  Did they have to get gas

12  on the way?

13  A.   Yes, they did.

14  Q.   Okay.  So whatever cars they went up in, did they split up

15  into teams at that point and decide who was going to be in what

16  car?

17  A.   That's correct.

18  Q.   So let's take the first car that had -- who was in the

19  first car, if you recall?

20  A.   Looking at my notes, the first car was Fox, Red, the --

21  another individual from Wisconsin, and Croft.

22  Q.   Okay.  And they were supposed to go to where when they got

23  to the vacation home area?

24  A.   They were going to the boat ramp area.  The bridge and the

25  boat ramp area.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    Q.   Okay.  Now, why would you -- if they discussed it -- why

2    would you need to go to a boat ramp?

3    A.   They were doing -- they were visually checking to see the

4    other side, if they could see lights from the house during the

5    nighttime.

6    Q.   Okay.  So if they were just going up there to spray paint

7    or vandalize her house or something like that, you wouldn't

8    really need to worry about the boat ramp on the other side,

9    right?

10   A.   That's correct.

11   Q.   Okay.  Did they discuss what they would use the boat ramp

12   for in any particular -- in any mission to kidnap her?

13   A.   Potentially using it for getting a boat for ex-fil and

14   getting out of the area.

15   Q.   Now I want to define that term.  You used another military

16   term, "ex-fil."  Would that be short for ex-filtration?

17   A.   That's correct.

18   Q.   That's what they called it?

19   A.   Correct.

20   Q.   So that would be what in this case?

21   A.   It would be getting yourself out of the area or after

22   accomplishing the mission how to egress or leave the scene or

23   where the event happened.

24   Q.   All right.  And if they had the governor, they could take

25   her that way?

1   A.   That's correct.

2   Q.   All right.  Again, if you were just going to go spray

3   paint her house or mess with her property or something, it

4   wouldn't make a lot of sense to go across the lake after that,

5   would it?

6   A.   Correct.

7   Q.   Did they also talk about looking for roads out to

8   Lake Michigan?

9   A.   Yes, they did.

10  Q.   And what was the purpose for that?

11  A.   To be able to get a boat and take the governor out on the

12  boat leaving the area out into the lake.

13  Q.   All right.  And again we'll get to this a little more

14  later, but when they were all arrested on October 7th, you

15  personally interviewed Mr. Fox, right?

16  A.   That's correct.

17  Q.   What, if anything, did he say about the governor and the

18  lake?  What was his plan?

19  A.   Mr. Fox stated his plan or his idea was to take her out on

20  the boat and leave her out in the middle of Lake Michigan.

21  Q.   Okay.  And do what with the engine?  Not dump her

22  personally into the water, right?

23  A.   Yep.  Disable the engine and just leave the boat with her

24  on it.

25  Q.   So somebody would have to come rescue her?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1  *A.*    That's correct.

2  *Q.*    Is that the idea?

3      Okay.  Now, that's the first car.  And we'll get to what

4  they did on the way in a moment.

5      The second car, do you recall who was in that car?

6  *A.*    That was Mr. Garbin, Franks, and another Wisconsin

7  individual.

8  *Q.*    Okay.  And what was their job?

9  *A.*    They were to drive by the residence and during that

10  drive-by they flashed their lights to see if they -- Mr. Fox

11  and other individuals across the lake could view their lights

12  as they drove by the residence.

13  *Q.*    Okay.  And were they actually able to see each other?  Did

14  they communicate?

15  *A.*    They were communicating via radio.  Hand-held radio.

16  *Q.*    Okay.  And they were able to see each other, right?

17  *A.*    They attempted to.  They said they did not see the

18  flashing lights from across the lake at that time.

19  *Q.*    But they communicated about it on their radios?

20  *A.*    That's correct.

21  *Q.*    Okay.  And then the third car was two other gentlemen from

22  Michigan, right?

23  *A.*    That's correct.

24  *Q.*    And what was their job?

25  *A.*    They were there to do counter-surveillance.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    *Q.*   Okay.  And those were people who had kind of just showed

2    up, had not been part of the discussions beforehand?

3    *A.*   That's correct.

4    *Q.*   Okay.  Now we mentioned Mr. Caserta stayed at the camp.

5    Mr. Harris stayed at the camp as well, right?

6    *A.*   That's correct.

7    *Q.*   Do you know why he stayed at the camp?

8    *A.*   He --

9    *Q.*   According to the informant?

10   *A.*   I cannot recall right offhand.

11   *Q.*   Did they meet up with him again in the morning?

12   *A.*   Yes, he did.

13   *Q.*   Did he express any feelings about having missed the

14   surveillance?

15   *A.*   Yeah, he stated he wished he would have been able to go.

16   Remorse for missing the trip.

17   *Q.*   Before they actually --

18           *MR. HILLS:*  I'm sorry.  If I can interrupt.  I don't

19   know who he is talking about with "he."

20           *MR. KESSLER:*  Mr. Harris.

21           *MR. HILLS:*  Thank you.

22   *Q.*   *(BY MR. KESSLER)*  You said he had expressed some remorse

23   for missing the trip?

24   *A.*   Yes, that's correct.

25   *Q.*   Okay.  Now, before they left did Mr. Fox ask another

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   individual to scan them all with a device?

2   A.   That's correct.

3   Q.   What kind of device was that?

4   A.   It was an RFI -- basically a device that scans for RFI

5   tracking or audio signals.

6   Q.   Is that a radiofrequency interference?

7   A.   That's correct.

8   Q.   What's the purpose of a device like that?

9   A.   To identify any potential recording devices or anything

10  that is transmitting.

11  Q.   Okay.  Well, obviously it didn't work, right?

12  A.   That's correct.

13  Q.   All right.  And were some of the parties armed when they

14  went and cased the governor's house?

15  A.   That's correct.

16  Q.   Do you recall who?

17  A.   The CHS told us that all individuals were armed at that

18  time.

19  Q.   All right.  Now, you interviewed Mr. Fox.  He denied being

20  armed, correct?

21  A.   That's correct.

22  Q.   All right.  Now, you mentioned -- let's back up to car 1.

23  You mentioned that they stopped somewhere else besides the gas

24  station on the way up there to the governor's house.

25       Where did they stop?

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1  A.   They stopped at the bridge.

2  Q.   That's the bridge that was discussed about taking -- this

3  is the one they discussed about taking down to stop the police

4  from getting there?

5  A.   That's correct.

6  Q.   Okay.  And did they actually -- did Mr. Fox actually post

7  some pictures afterwards of what they did?

8  A.   Yes.

9  Q.   All right.  Let's go ahead and take a look at that.

10       I'm going to bring up 17 for identification.  So this is

11  their encrypted chat again, and the name at the top, Alpha Fuck

12  You, that's Mr. Fox, right?

13  A.   That's correct.

14  Q.   Okay.  So this is -- the informant asked him "Did you get

15  any pics of the bridge?"  He had told him about going to the

16  bridge, right?

17  A.   That's correct.

18  Q.   Let's -- so what is this picture we're looking at right

19  here?  I'll blow it up.

20  A.   That would be the underside of the bridge.

21  Q.   Okay.  So this car with Mr. Fox, Mr. Croft, and Red, the

22  supposed -- the undercover supposed firearms expert stopped by

23  the side of the road, right?

24  A.   Yes.  Red is the explosives expert.

25  Q.   Okay.  And so Red and Mr. Fox got out and went under the

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    bridge?

2    A.   That's correct.

3    Q.   All right.  So you know that now from an FBI agent too,

4    correct?  He was under there with them?

5    A.   That's correct.

6    Q.   All right.  And what did Mr. Fox describe this as being?

7    What did they talk about?

8    A.   They discussed placing explosives to take down the bridge.

9    Q.   And he says "Man can get right up in there," right?

10   A.   That's correct.

11   Q.   Okay.  Now that's actually Red talking about that, but

12   Mr. Fox was the one that took this picture?

13   A.   That's correct.

14         MR. KESSLER:  Okay.  Offer 17, Your Honor.

15         THE COURT:  Any objection?

16         MR. GRAHAM:  No, Your Honor.

17         MR. HILLS:  No, Your Honor.

18         THE COURT:  It's admitted.

19   Q.   (BY MR. KESSLER)  Now, on the way back and back at the

20   camp they all talked about what they had done on this

21   surveillance, right?

22   A.   That's correct.

23   Q.   Now, somebody brought up the actual notion of kidnapping

24   again at this point.  They started talking about it, right?

25   A.   That's correct.

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    Q.   And did they seem to be joking and kidding about it in

2    their -- in the recording?

3    A.   Yes, they did.

4    Q.   That was recorded by the CHS?

5    A.   That's correct.

6    Q.   Okay.  Now, before I play it, there's a lot of crosstalk

7    here.  Have you listened to it a number of times?

8    A.   Yes, I have.

9    Q.   All right.  You can't necessarily identify exactly who is

10   who, but you recognize some of the voices?

11   A.   That's correct.

12   Q.   Okay.  And when somebody mentions kidnapping, they kind of

13   start laughing about it, right?

14   A.   Yes.

15   Q.   Okay.  Let's sort of piece it out.  I may have to play it

16   more than once so we can get the little pieces that they talk

17   about.

18        I'm going to bring up 18 for identification.  And let me

19   play that.

20        (*Audio playing*)

21        All right.  So somebody to start with said, "If you're not

22   down for kidnapping, get out of here" basically, right?

23   A.   That's correct.

24   Q.   Okay.  And then they start laughing.  Somebody said,

25   "What, no children?"

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    A.   Somebody makes a comment regarding not kidnapping, no

2    children.  Adult napping.

3    Q.   Okay.  And then they start talking about property

4    destruction, right?

5    A.   That's correct.

6    Q.   Did they start kidding about how easy that would be?  Just

7    hire -- what did they say?

8    A.   They discussed "Kidnapping, arson, death.  I don't care."

9    Q.   And do you know which -- did you recognize which voice it

10   was who said that?

11   A.   That would have been -- it's believed to be -- excuse

12   me -- it's believed to be Franks.

13   Q.   Mr. Franks?

14   A.   Yes.

15   Q.   Kidnapping, arson, death, down for anything?

16   A.   That's correct.

17        MR. GRAHAM:  Your Honor, I'm going to object.  "It's

18   believed to be" is so vague that I don't think it's appropriate

19   and I move to strike that.

20        THE COURT:  Again, it goes to weight as opposed to

21   admissibility.  But your objection is noted.

22   Q.   (BY MR. KESSLER)  And Mr. Franks was there for that

23   conversation even if it wasn't --

24   A.   That's correct.

25   Q.   Even if for some reason you're not sure exactly who,

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    right?

2    *A.*    That's correct.

3    *Q.*    Okay.

4              *MR. KESSLER:*  I offer 18 into evidence.

5              *THE COURT:*  Any objection?

6              *MR. GRAHAM:*  I guess just the objection I made.

7    Nothing else.

8              *THE COURT:*  All right.  It's admitted.

9    *Q.*    *(BY MR. KESSLER)*  All right.  Now -- you know, let me back

10   up and just capture one thing.

11         You mentioned when they went under the bridge Mr. Fox and

12   Mr. Croft were in car number 1, right?

13   *A.*    That's correct.

14   *Q.*    Did Fox say something about the governor having

15   uncontrolled power?

16   *A.*    That's correct.

17   *Q.*    And what did Mr. Croft say to that?

18   *A.*    Um, I don't recall the exact words at this time.

19   *Q.*    All right.  "All good things must come to an end?"  Does

20   that sound familiar?

21   *A.*    That's correct.

22   *Q.*    All right.  Now, after they got back did the group all

23   circle up the next morning on September 13th?

24   *A.*    Yes, they did.

25   *Q.*    And to be specific, Fox, Croft, Garbin, Franks, Harris,

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

 1  and Caserta were all part of that discussion?

 2  A.   That's correct.

 3  Q.   And according to the CHS and other undercover employees

 4  who were there did Mr. Fox confirm that the plan was to kidnap

 5  the governor?

 6  A.   Yes, he did.

 7  Q.   Now, what did Red tell Mr. Fox and Mr. Croft about getting

 8  explosives for the bridge?

 9  A.   Red estimated it would cost approximately 4,000 for the

10  explosives to blow up the bridge.

11  Q.   Okay.  And did the group discuss what they would have to

12  do to raise that kind of money?

13  A.   Yes, they did.

14  Q.   What did they agree to do?

15  A.   They basically set a plan for a future FTX and in the

16  meantime raise the cash through either the group funds and

17  other means to -- for that time for Red.

18  Q.   So everybody should just save up money until then --

19  A.   Yes.

20  Q.   -- for that purchase?

21       Okay.  Now, you mentioned earlier that Mr. Fox had talked

22  about a timeline for doing this before the election.

23  A.   That's correct.

24  Q.   And you just said a moment ago that they were -- they

25  talked about having one more FTX before that, right?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    A.   That's correct.

2    Q.   So did they have some discussions about exactly when they

3    were going to hold that?

4    A.   Yes, they did.

5    Q.   So was the last week in October initially proposed?

6    A.   It was.

7    Q.   What did Mr. Fox have to say about that?

8    A.   Fox did not want it that last weekend.  He wanted it a

9    week prior.  Because if they held it the last weekend in

10   October, it would only leave three days until the election.

11   Q.   And wouldn't leave them enough time after their practice

12   then?

13   A.   That's correct.

14   Q.   Okay.  Now, we talked earlier about how this group had

15   months ago participated in some of those armed rallies at the

16   Capitol, right?

17   A.   That's correct.

18   Q.   Now, have other members of the Wolverine Watchmen and

19   other militia groups continued to do that?

20   A.   Yes, they have.

21   Q.   Did this group discuss the need to keep their profile

22   lower?

23   A.   Yes, they did.

24   Q.   Okay.  And that was after the surveillance at the

25   governor's house?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    A.    Correct.

2    Q.    So let's take a look at Exhibit 19 for identification.

3    And they talked about it on the FAFO chat, correct?

4    A.    Correct.

5    Q.    All right.  Now, we can see at the top of it -- I want to

6    just blow that up just so we know all who is on this chat -- we

7    have got Debased Tyrant, that's Mr. Caserta, right?

8    A.    Correct.

9    Q.    Alpha Fuck You is Mr. Fox?

10   A.    Correct.

11   Q.    Beaker is Mr. Harris?

12   A.    Correct.

13   Q.    Me is the informant.  Gunny is Mr. Garbin?

14   A.    Correct.

15   Q.    Squatch is another individual.  Red Hot is Mr. Franks.

16   And then Kevin, Texas, and Mark are other individuals, right?

17   A.    Pardon?

18   Q.    Kevin, Texas, and Mark are other individuals not in this

19   room?

20   A.    Correct.

21   Q.    Okay.  So did they discuss an invitation that they had

22   received to participate in another one of those public

23   demonstrations at the Capitol?

24   A.    Yes, they did.

25   Q.    So let's take a look at this first one.  It's from

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   Adam Fox using his name.  "So Grandpa wants us to meet up at

2   the Capitol this Sunday full kit at 3 p.m. for a meeting.  What

3   do you all think?"

4        So he's gotten an invitation from someone named -- who

5   goes by Grandpa.  Do you know who they are referring to?

6   A.   Yes, that's Pete Musico.

7   Q.   Pete Musico?

8   A.   That's correct.

9   Q.   And he's a little older gentleman?  Maybe my age,

10  something like that?

11  A.   That's correct.  Or way older.

12  Q.   Okay.  So they refer to him as Grandpa?  They are all

13  younger than he is?

14  A.   Yes.

15  Q.   Okay.  And so he's -- Mr. Fox is -- let's just go to the

16  next one.  What's he asking?

17  A.   He wants to get a group consensus regarding their

18  participation.

19  Q.   All right.  And let's take a look at what people had to

20  say.  So here is -- I'm just going to focus on people in this

21  room.  Gunny, that's Mr. Garbin, what did he say?

22  A.   He's stating "Negative.  We agreed on multiple occasions

23  no protests."

24  Q.   Okay.  And Gunny, that's again Mr. Garbin, he expands on

25  that, right?  What does he say?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   A.   He highly advises minimizing any communication with

2   Musico.   And there is zero, and he meant zero, public

3   interaction if they want to continue with their plans.

4   Q.   So this is the same group that was worried about that

5   person Doc getting their faces seen if somebody had figured out

6   their code words and code names, right?

7   A.   That's correct.

8   Q.   And now they are concerned nobody ought to see them at

9   some public demonstration right before he says "their plans"?

10  A.   That's correct.

11  Q.   And Mr. Caserta had an opinion about Mr. Musico.   What did

12  he say?

13  A.   He agrees no more protests and explains that Musico is

14  searching for clout.   And it's too hot for them to be

15  associating with him at the moment.

16  Q.   Okay.   And what else -- let me blow this up.

17       What else did Mr. Caserta have to say?   They talk about

18  the idea of like striking fear through presence, right?

19  Showing up with guns at the Capitol?

20  A.   That's correct.

21  Q.   What did Mr. Caserta have to say about that?

22  A.   So they talk about striking fear, and then he says "When

23  the time comes, there will be no need to try and strike fear

24  through presence.   The fear will be manifested through

25  bullets."

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   *Q.*   And is that pretty much the split between these two

2   groups?  One liked to be out in public showing up with their

3   guns at the Capitol?

4   *A.*   That's correct.

5   *Q.*   This group was a little more action-oriented?

6   *A.*   Yes, that's correct.

7   *Q.*   And Red Hot, that would be Mr. Franks -- well, first

8   off -- sorry.  Skipping ahead.

9       It looks like Mr. Fox agreed with that sentiment?

10  *A.*   That's correct.

11  *Q.*   "Copy that, boys, loud and clear?"  And then Mr. Franks

12  says what?

13  *A.*   "Hard pass on anything in public."

14  *Q.*   All right.  And then Mr. Fox told Mr. Musico they were not

15  going, right?

16  *A.*   That's correct.

17  *Q.*   Okay.

18          *MR. KESSLER:*  I offer 19 into evidence.

19          *THE COURT:*  Any objection?

20          *MR. SPRINGSTEAD:*  No.

21          *MR. HILLS:*  No objection.

22          *MS. NIEUWENHUIS:*  No.

23          *THE COURT:*  It's admitted.

24  *Q.*   *(BY MR. KESSLER)*  So the time is getting short at this

25  point.  There's only a couple weeks left until the election,

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    right?

2    A.   Correct.

3    Q.   Did some of the members start talking about tying up loose

4    ends that they might have out there?

5    A.   Yes.

6    Q.   Now, maybe this is a time to just mention.  The boogaloo,

7    this whole idea that they have talked about, does that involve

8    the notion that the whole government is going to collapse and

9    it will be anarchy or chaos?

10   A.   That's correct.

11   Q.   All right.  And they think this might trigger it or it

12   might be triggered by other things in the near future?

13   A.   That's correct.

14   Q.   Okay.  So back to tying up loose ends here.  I want to

15   bring up what I've marked as Exhibit 20.

16       Okay.  Now, we'll come back to this later, but Mr. Caserta

17   had been pulled over by the cops.  That's what started this,

18   right?  Where he's saying "Injustice just happened to me on my

19   way home from work"?

20   A.   That's correct.

21   Q.   That's what starts the discussion.  And he's saying he was

22   robbed for expired insurance.  He was driving apparently

23   without up-to-date insurance.

24   A.   That's correct.

25   Q.   Okay.  So they get started talking, and it looks like

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1    somebody -- this is actually Mr. Fox -- posts something from

2    Facebook about Governor Whitmer, right?

3    A.    That's correct.

4    Q.    And he reminds the group what?

5    A.    That she needs to go ASAP.

6    Q.    And he refers to her --

7    A.    As bitch.

8    Q.    As bitch.  Okay.

9          Mr. Caserta talks about the police again.  He's angry

10   about the police.  And let's see.  So two officers had pulled

11   him over for the insurance thing.  And that was in Canton,

12   Michigan, correct?

13   A.    That's correct.

14   Q.    Okay.  And what does Mr. Caserta say he wants to do?  If

15   you would read that.

16   A.    Mr. Caserta said he has the two guys' names.  He's

17   considering doing a recon.  He knows they work night shift.

18   And states he could easily tap them and dip and no one would

19   know a thing.  And then further follows up saying it would be

20   good practice.

21   Q.    Now, that's kind of slang.  He'd tap them and dip.  But

22   tap them meaning shoot them?

23   A.    That's correct.

24   Q.    So he's talking about finding where the two police

25   officers who pulled him over live and shooting them at night?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   A.   That's correct.

2   Q.   Okay.  Now, again, talking about the time being short,

3   Mr. Fox says he's trying to get us as many reps as possible.

4   A.   That's correct.

5   Q.   In talking to the informant and the undercovers who were

6   involved, what do they mean by getting in reps?

7   A.   Tactically as a group together and planning together or

8   actually doing movements and stuff together.

9   Q.   So they are trying to be ready for action?

10  A.   That's correct.

11  Q.   Okay.  And he reminds everybody that it's only six weeks

12  until the election, correct?

13  A.   That's correct.

14  Q.   And then they talk about having plans for what happens

15  after the boogaloo, right?

16  A.   That's correct.

17  Q.   So what does he say here?

18  A.   They need a plan in place in case the plan goes bad.

19  Q.   Okay.

20  A.   What they are going to do afterwards.

21  Q.   And just as an aside, do they all talk about something

22  called go bags?

23  A.   That's correct.

24  Q.   Mr. Fox had actually sent pictures of his go bag, right?

25  A.   Yes, he did.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   Q.   And what is a go bag?

2   A.   A go bag is in case you need to leave somewhere

3   immediately.  It's a bag that is already packed with supplies

4   you need to survive for any number of days or weeks.

5   Q.   All right.  So there was discussions about that as well?

6   A.   That's correct.

7   Q.   Like everybody having their go bags packed?

8        And they talk about one more thing they need to practice.

9   Let's bring up this section right here.  This is a discussion.

10  First Mr. Fox mentioned this to the whole group and then

11  there's a response from Mr. Caserta.

12       Can you just read what Mr. Fox suggested.

13  A.   Mr. Fox suggests, he says, "I'm going to get the basement

14  of the store cleared, and if anyone wants, we can do CQC

15  training here, clearing this big-ass building upstairs and

16  down.  Work on acquiring an asset and detaining for

17  extraction."  And then Mr. Caserta responds "That sounds pretty

18  tight."

19  Q.   All right.  Let's just break that down a little bit.  I

20  don't know what CQC is.  Do you know what that is?

21  A.   That's close-quarters combat.

22  Q.   Okay.  So they are talking about doing close-quarters

23  combat in the basement of the vacuum cleaner store?

24  A.   That's correct.

25  Q.   All right.  And that's -- and they say "training clearing

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   this building upstairs and down." So that would be like what

2   they did at the last FTX, training on clearing a building?

3   A.   That's correct.

4   Q.   And then they say "Work on acquiring an asset and

5   detaining for extraction." They are using a lot of military

6   lingo here. But what would the asset be?

7   A.   The asset would be a hostage or somebody that they are

8   trying to get from that place and then removing them from the

9   environment for extraction or removal.

10  Q.   So they are talking at this point about practicing for

11  going into a building and taking somebody out, right?

12  A.   That's correct.

13  Q.   And Mr. Caserta says "That sounds pretty tight"? In other

14  words, he's enthusiastic about the idea?

15  A.   That's correct.

16  Q.   Okay.

17          MR. KESSLER:  I'll move 20 into evidence.

18          THE COURT:  Any objection?

19          MR. GRAHAM:  No.

20          MR. HILLS:  No objection.

21          MR. SPRINGSTEAD:  No objection.

22  Q.   (BY MR. KESSLER)  Now, we've seen a lot of --

23          THE COURT:  Hang on a second, Mr. Kessler. It's

24  admitted, but can you indicate who is on this particular

25  text-message string?

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

```
 1              MR. KESSLER:  I'm sorry, Your Honor?

 2              THE COURT:  Can you put some evidence in as to who

 3    was on this particular text-message string?  I see Mr. Fox and

 4    Mr. Caserta, but who else?

 5              MR. KESSLER:  I think we did it at the beginning.

 6              THE COURT:  At the top there?

 7              MR. KESSLER:  I'll do it one more time.

 8              THE COURT:  Ah, we're still on that same one.

 9    Q.   (BY MR. KESSLER)  So at the very top here we have

10    Debased Tyrant.  That would be Mr. Caserta, correct?

11    A.   Correct.

12    Q.   Alpha Fuck You would be Mr. Fox?

13    A.   Correct.

14    Q.   Beaker is Mr. Harris?

15    A.   Yep.

16    Q.   Gunny is Mr. Garbin?

17    A.   That's correct.

18    Q.   Someone named Squatch who is not part of this group.

19    A.   Correct.

20    Q.   Red Hot is Mr. Franks?

21    A.   Correct.

22    Q.   And then the last three -- Kevin, Texas, and Mark -- are

23    all individuals who are not part of this group, correct?

24    A.   That's correct.

25              THE COURT:  Thank you.
```

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1          MR. KESSLER:  You're welcome, Your Honor.

2     Q.   (BY MR. KESSLER)  All right.  So we've seen a lot with

3     guns and explosives and things that could be used for shooting.

4          Did Mr. Fox acquire anything that really only could be

5     used against a live person?

6     A.   Yes, he acquired a Taser --

7     Q.   A Taser.

8     A.   -- that he sent a photo to the group of.

9     Q.   Okay.  Did he text about that, chat about the Taser with

10    the group?

11    A.   Yes, he did.

12    Q.   And what did he say about it?

13    A.   He stated he just had received it, and then I believe it

14    was a video he sent to them of that explaining the use for

15    using at a later point.

16    Q.   All right.  That could be used for basically zapping a

17    person that you're -- an asset that you're going to extract?

18    A.   That's correct.

19    Q.   Let's bring up Exhibit 21 for identification.  You

20    mentioned that he sent a video.  Is this the video?

21         Let's see if I can get it to play.  If I can, I'm going to

22    do it straight from the computer.

23         (Video playing)

24         That's the Taser?

25    A.   Yes, it is.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1  *Q.*  And he sent that to other members of the group through the

2  encrypted chat?

3  *A.*  That's correct.

4          *MR. KESSLER:*  Okay.  I would move 21 into evidence.

5          *THE COURT:*  Any objection?

6          *MR. SPRINGSTEAD:*  No, Your Honor.

7          *MR. GRAHAM:*  Your Honor, there's a statement he sent

8  it to the other members, but I don't see anything showing that.

9          *THE COURT:*  So this is just a question of whether or

10  not this video is admitted.  Obviously what Mr. Kessler says is

11  not evidence, so he'll need to clear up the record on that.

12          But do you have an objection to the video being

13  admitted?

14          *MR. GRAHAM:*  If he didn't send it in a chat linked to

15  my client, I object to its admission as to Mr. Franks.

16          *THE COURT:*  Mr. Kessler.

17          *MR. KESSLER:*  Well, this is a prelim for everybody.

18  *Q.*  *(BY MR. KESSLER)*  But did he send it to that group, to

19  your knowledge?

20  *A.*  Yes, he did.

21  *Q.*  Now, we don't know whether Mr. Franks viewed the video or

22  not, right?

23  *A.*  That's correct.

24  *Q.*  But he was a member of the chat group that received this

25  picture?

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    *A.*   That's correct.

2              *THE COURT:*  All right.  It's admitted.

3    *Q.*   *(BY MR. KESSLER)*  Now let's go back a little.  At the

4    conclusion of the FTX in Wisconsin where they talked about

5    acquiring explosives, you said Red, the undercover, said they

6    would need to raise $4,000?

7    *A.*   That's correct.

8    *Q.*   All right.  Did they -- we mentioned that they were all

9    arrested on October 7th.  Did the group discuss pooling their

10   money?

11   *A.*   They did.

12   *Q.*   Okay.  And did they also discuss bringing it on

13   October 7th?

14   *A.*   Yes.

15   *Q.*   What was the nature of the meeting supposed to be on

16   October 7th?

17   *A.*   Red was traveling into the area and was meeting to do a

18   show and tell for them to pick out the types of explosives and

19   how they wanted them set up.  And also the group members were

20   bringing a down payment or a deposit to Red for those

21   explosives.

22   *Q.*   And they were also supposed to be picking up some gear

23   that they might be interested in?

24   *A.*   That's correct.

25   *Q.*   All right.  So that was kind of the enticement?  Red said,

*DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   "We might have some gear left over"?

2   A.   That's correct.

3   Q.   Okay.  Let's bring up Exhibit 22.  Do they actually talk

4   about bringing the group cash?

5   A.   Yes, they did.

6   Q.   Okay.  And now this is the same chat group, correct?  This

7   one says Beaker.  This is talking to the CHS?

8   A.   That's correct.

9   Q.   Okay.  So the CHS tells them "Red will be passing through

10  Ypsilanti near 94," basically saying he's going to be in town,

11  opportunity to meet, right?

12  A.   That's correct.

13  Q.   And he'll have some gear to drop off that people left at

14  the last training?

15  A.   Correct.

16  Q.   Okay.  And Beaker, that's Mr. Harris, sounds interested,

17  right?  "Dope.  You sellin' or givin'?"

18  A.   Correct.

19  Q.   Okay.  Now, he says he's talking about giving the gear,

20  but the informant says -- he asked Adam -- that would be

21  Mr. Fox, right?

22  A.   That's correct.

23  Q.   "If we should throw some money at him not for gear but

24  good faith for FTX goods"?

25  A.   That's correct.

DIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   Q.   That's the explosives transaction they were talking about?

2   A.   Yes, it is.

3   Q.   Okay.  And what did Beaker respond?

4   A.   He says he's down, and then he suggests they've got the

5   group cash to use.

6   Q.   Okay.  And he also suggests talking to everybody else

7   about it, right?

8   A.   He suggests talking to the entire group to see if they are

9   cool with using it and then adds that he'll pitch in a little

10  more.

11  Q.   Okay.  You also listened to a recorded call with Mr. Fox,

12  right, where he discusses who is coming to that October 7th

13  meeting with the undercover?

14  A.   Yes.  Yes, I did.

15  Q.   Okay.  Did he mention all of these other individuals in

16  the room as potentially coming with him?

17  A.   That's correct.

18  Q.   Okay.  They were all arrested there with the exception of

19  Mr. Caserta, right?

20  A.   Correct.

21  Q.   Okay.  And Mr. Caserta was at work and couldn't make it;

22  is that correct?

23  A.   Correct.

24  Q.   And Mr. Croft was in Delaware?

25  A.   Yes.

1   Q.    Okay.  The rest went and they were arrested there.

2   Mr. Croft was arrested in Delaware, right?

3   A.    Correct.

4   Q.    Okay.  And Mr. Caserta was arrested near his home?

5   A.    He was arrested at his employment.

6   Q.    At his place of work.

7   A.    Yes.

8              MR. KESSLER:  I have nothing further, Your Honor,

9   except on detention which we'll take up later.

10             THE COURT:  Very well.  Let's take a 15-minute break

11  at this point and come back and do cross-examination at that

12  time.

13             Mr. Kessler, do you have paper copies of the picture

14  evidence and can we get a copy of that?

15             MR. KESSLER:  I do.

16             THE COURT:  All right.  Thank you.  All right.  We'll

17  be back in 15 minutes.

18             THE CLERK:  All rise, please.  Court is in recess.

19       (Recess taken at 11:05 a.m.)

20       (Back on the record at 11:31 a.m.)

21             THE COURT:  All right.  We're back on the record.

22             Mr. Kessler, had you completed your examination?

23             MR. KESSLER:  Just one thing I -- yes, I've completed

24  the examination, Your Honor.  I just wanted to be sure that I

25  had moved 22 and 19 into evidence.  I believe I did 19, but

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    just to be safe.

2         *THE COURT:*  Well, we will be safe on that front.  So

3    any objection to either of those exhibits?

4         *MR. GRAHAM:*  No, Your Honor.

5         *MS. NIEUWENHUIS:*  No, Your Honor.

6         *MR. SPRINGSTEAD:*  No, Your Honor.

7         *MR. HILLS:*  No, Your Honor.

8         *THE COURT:*  All right.  They are admitted.

9         *MR. KESSLER:*  That's all I have, Your Honor.

10         *THE COURT:*  Given that Ms. Nieuwenhuis and

11   Mr. Springstead wish to reserve, correct, on their

12   cross-examination today, I think that brings us to Mr. Graham.

13         *MR. GRAHAM:*  Your Honor, could I start from here for

14   a second just because of convenience for the witness?

15         *THE COURT:*  Absolutely.

16                         CROSS-EXAMINATION

17   *BY MR. GRAHAM:*

18   *Q.*   Did you bring some notes today that you referred to during

19   your direct examination?

20   *A.*   Yes, I did.

21   *Q.*   And do you have those?

22   *A.*   Yes, I do.

23   *Q.*   Do you have notes with you other than a simple copy of the

24   Complaint?

25   *A.*   I'm not understanding your question.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1   Q.   You signed the Complaint in this case?

2   A.   That's correct.

3   Q.   And the Affidavit supporting the Complaint?

4   A.   That's correct.

5   Q.   Do you have any materials with you in addition to that

6   Complaint?

7   A.   Yes, I do.

8   Q.   Okay.  Can I see those?

9   A.   Yes, sir.

10  Q.   Agent, are these file cards that you made to help you

11  testify here today?

12  A.   They are cards with notes to recall certain events, yes.

13  Q.   I understand.  But you prepared them for the purpose of

14  helping you today, right?

15  A.   That's correct.

16  Q.   They weren't prepared as part of the investigation proper

17  or anything else; is that correct?

18  A.   That's correct.

19  Q.   When you prepared these file cards, what did you look at?

20  A.   Portions of the Complaint and discussion -- or going

21  through the dates that we referenced in the Complaint.

22  Q.   Did you talk with anyone else about matters that are

23  reflected on your file cards?

24  A.   Just the U.S. Attorney's Office.

25  Q.   Okay.  No other agents or investigators?

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1  A.   Not that I can recall.  They were made last night.

2  Q.   So in fact you got together and prepped or prepared for

3  your testimony today, right?

4  A.   That's correct.

5  Q.   And you made some file cards to help you recite the facts

6  that you talked about when Mr. Kessler asked you questions,

7  right?

8  A.   To refresh my memory if needed, yes.

9  Q.   Sure.  And so when you testified you only used the file

10  cards that you've handed me, didn't look at any other

11  materials, right?

12  A.   That's correct.

13  Q.   Okay.  I'm going to return these to you and thank you for

14  showing them to me.  (Handing).

15       MR. GRAHAM:  Your Honor, at this time I would move

16  for the production from the government of any statement they

17  might have that qualifies under Rule 26.2.  I think it flows

18  into this proceeding under Rule 5.1.  And -- so anyway, I would

19  make that motion.

20       THE COURT:  Mr. Kessler.

21       MR. KESSLER:  Yes, Your Honor.  And I've prepared

22  that.  Your Honor, I've prepared that and I'm ready to hand it

23  over to Mr. Graham, which I'm doing right now.  I just wanted

24  to put on the record that we've redacted some things in there.

25  There are search warrant affidavits that Agent Trask has sworn.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    The redacted information is personally identifying information

2    like phone numbers of individuals.  There's the actual location

3    of the governor's house which we didn't want to be public,

4    names of unindicted coconspirators, and one informant in there.

5    So we had originally done those without any redactions

6    obviously for the Court because they were under seal.  I'm

7    producing them to Mr. Graham now under 26.2, but I'm just

8    putting on the record why those redactions are in place.

9           *THE COURT:*  All right.  Mr. Graham, your motion is

10   granted.  Do you have any issue with the redactions that

11   Mr. Kessler has just enumerated?

12          *MR. GRAHAM:*  No, Your Honor.

13          *THE COURT:*  All right.  You may proceed.

14          *MR. GRAHAM:*  The only thing I would ask, Your Honor,

15   I'll try to keep my questions as pointed as possible here, but

16   then when I sit down and someone else asks, if I look at these

17   and see something, if I could have a little bit of latitude if

18   there's something new.

19          *THE COURT:*  Yes, that's fine.

20          *MR. GRAHAM:*  Okay.  Thank you.

21   *Q.*   *(BY MR. GRAHAM)*  Agent, I think you indicated that you

22   work in the area of counter-terrorism and other related areas?

23   *A.*   That's correct.

24   *Q.*   Why don't you tell me generally your training to work in

25   the area of counter-terrorism.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1   *A.*   So over the past approximately nine years with the FBI I

2   have attended multiple trainings to include counter-terrorism

3   investigative training.  It was a course put on by the FBI to

4   provide specific training towards counter-terrorism

5   investigations.

6   *Q.*   Okay.  So a number of seminars, programs, whatever you

7   want to call them, providing instruction to you and others

8   working in the area; is that fair?

9   *A.*   That's correct.

10   *Q.*   And give me your -- an estimate of how many such sessions

11   you've attended.

12   *A.*   Um, I've been through a multitude of trainings with FBI

13   specific to counter-terrorism.  I know of at least one.  I

14   can't recall the others at this time.

15   *Q.*   Okay.  You think it's been 10 or 12 or is it just total?

16   *A.*   We go through ongoing training on a yearly basis of

17   different varieties on related matters.

18   *Q.*   Now, are you with a unit that is headquartered in a

19   certain spot?

20   *A.*   Um, I work -- are you asking where I work out of?

21   *Q.*   Yeah.

22   *A.*   I work out of the Kalamazoo RA for the Detroit Division.

23   *Q.*   Okay.  Okay.  So when you do this training and get FBI

24   training, then do you -- do people from around the country

25   gather for the training or is this something that's done

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    locally?

2    A.    Both.

3    Q.    Do you have others working locally assigned to

4    counter-terrorism?

5    A.    Yes.

6    Q.    So over the years then -- well, let me ask you, how many

7    counter-terrorism investigations do you think you've been

8    involved in in some capacity?  Just an estimate.  I know you

9    don't know.

10   A.    An estimate would be probably over 20 --

11   Q.    Okay.

12   A.    -- or so over the past several years.

13   Q.    Okay.  So in doing these, being involved in these

14   investigations, between that and your training, you're kind of

15   immersed in how to combat counter-terrorism.  Is that fair?

16   A.    Fair enough.

17   Q.    Work-wise?

18   A.    Yes.

19   Q.    Okay.  So in your work, then, I assume that you have dealt

20   fairly often with groups that fall under this label "militia."

21   Is that fair?

22   A.    Yes.

23   Q.    In fact, it's quite common in your work, isn't it?

24   A.    Yes, it is.

25   Q.    And you've come to study these groups and their tendencies

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1  and traits generally, haven't you?

2  A.   That's correct.

3  Q.   I mean, that's been a very important part of what you do,

4  to try to figure out whether there's a legitimate

5  counter-terrorism threat, right?

6  A.   That's correct.

7  Q.   In fact, as you look at these groups that fall under the

8  label "militia," you find a lot of people who really they talk

9  about things but they are never a real threat to do anything.

10  You've seen that, haven't you?

11  A.   Yes, that is correct.

12  Q.   It's fairly common within these groups, isn't it?

13  A.   It can be, yes.

14  Q.   Yeah.  Sure.  Big talk.  I'll use a term.  My term.  Big

15  talk between crackpots.  You've seen that, haven't you?

16  A.   Not that specific term, but, yes, I understand your

17  intention.

18  Q.   Well, my intention is people who talk a lot, talk brashly,

19  boldly, but are never going to do anything to act on that talk.

20  That's what I call a crackpot.  Whether right or not.  You've

21  seen people like that, right?

22  A.   I can't always speak to their intention, but, yes, I have

23  seen that on an individual basis, yes.

24  Q.   Well, a good point.  You don't know -- obviously you go on

25  the facts presented, but you don't really know the intention of

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    people, because just like you don't know if they are a

2    crackpot, you don't know if they are serious.  Fair?

3    A.   That would be the purpose of the investigation, to

4    determine that, yes.

5    Q.   Sure.  So in studying and working on these militia matters

6    you have found, haven't you, that these tactical training

7    sessions are quite common, haven't you?

8    A.   That is correct.

9    Q.   And again I'm talking now generally.  Not in regard to

10   this particular case but your expertise.  And let me ask this:

11   You used that expertise both to create the Complaint and in

12   giving your testimony today, right?

13   A.   That's correct.

14   Q.   When you would draw conclusions based upon certain

15   language, timing, activities, terms, a lot of that was based

16   upon your work experience and your training, correct?

17   A.   That's correct.

18   Q.   Okay.  By the same token your expertise allows you to say

19   that there are a lot of tactical training sessions by militia

20   groups that ultimately have no criminal purpose.  Is that fair?

21   A.   That's correct.

22   Q.   In fact, there's kind of a military wannabe -- again my

23   term -- theme that runs through some of these militias, right?

24   A.   I would classify it as camaraderie, similar to military,

25   yes.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    Q.   Okay.  Okay.  But military lingo, terminology, that's very

2    common, right?

3    A.   Yes.

4    Q.   I mean, you've talked about a lot of that here, right?

5    A.   Yes.

6    Q.   And a lot of it was used, right?

7    A.   That's correct.

8    Q.   Military drills.  Military-style drills.  You've seen a

9    lot of that in this case, haven't you?

10   A.   That's correct.

11   Q.   You talked about the question of clearing a room, clearing

12   a house, something of that sort.  And that certainly is

13   something that law enforcement is trained to do, correct?

14   A.   That's correct.

15   Q.   And it's something that the military is trained to do,

16   correct?

17   A.   Correct.

18   Q.   So that's part and parcel of this whole military culture,

19   if you will, that often applies in the militia settings.  Fair?

20   A.   I would often say room clearing is not a common standard

21   for militia that we typically see.

22   Q.   Okay.  But you've seen it before in the militias?

23   A.   We have.

24   Q.   This isn't the first time, right?

25   A.   Correct.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    *Q.*    When you've seen it before it was in a situation that did

2    not lead in any way to criminal activity, right?

3    *A.*    That's correct.

4    *Q.*    Okay.  Now, there was some talk about -- about Kaleb

5    taking a gun to Wisconsin that had a suppressor on it.  And

6    you're aware of that, right?

7    *A.*    Yes, that's correct.

8    *Q.*    That allegation was contained in the Complaint, right?

9    *A.*    That's correct.

10   *Q.*    Now, the Complaint in this case is something you signed,

11   right?

12   *A.*    Yes.

13   *Q.*    Under oath?

14   *A.*    Yes.

15   *Q.*    And so if I interchange the terms "Complaint" and

16   "Affidavit," I'm just talking about that one document that is

17   labeled "Criminal Complaint."  Okay?

18   *A.*    I understand.

19   *Q.*    Okay.  So you indicated in the Complaint that Kaleb took a

20   long gun to Wisconsin and it had a silencer on it or a

21   suppressor, right?

22   *A.*    That's correct.

23   *Q.*    Because your investigation showed that, correct?

24   *A.*    Yes.

25   *Q.*    And you also ran an ATF check to see if he had a tax stamp

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    for any suppressor, didn't you?

2    A.    I did not personally run that.

3    Q.    Well, but someone did, right?

4    A.    Yes.

5    Q.    And -- okay.  Someone determined that he did have a tax

6    stamp for a suppressor, right?

7    A.    That's correct.

8    Q.    And did anyone check -- when his house was searched a

9    number of weapons were seized, weren't they?

10   A.    That's correct.

11   Q.    And one of them was an AR-15, correct?

12   A.    I do not have that information at this time.

13   Q.    Okay.  Do you know whether anyone pulled from a weapon

14   seized from his house his tax stamp for the suppressor that we

15   saw in Wisconsin?

16   A.    Again, I don't have that information at this time.

17   Q.    You simply know that based on what the ATF told you he in

18   fact did have a tax stamp for one suppressor, correct?

19   A.    That's correct.

20   Q.    And you saw a suppressor on the rifle that he had in

21   Wisconsin?

22   A.    That's correct.

23   Q.    Now, when you -- you just mentioned something about

24   something you didn't do.  I want to make sure that I understand

25   exactly how you pulled together the information in this case to

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    allow you to sign the Complaint.

2         So I assume -- let me ask you first:  Are you what is

3    sometimes called the case agent in this matter?

4    A.   I am one of the case agents, yes.

5    Q.   Okay.  Help me understand, as one of the case agents are

6    you the agent who is in charge of ultimately this

7    investigation?

8    A.   I am in charge of running one investigation.  That is my

9    responsibility, yes.

10   Q.   Okay.  And is that one investigation the investigation

11   that led to the charges here?

12   A.   It is part of it, yes.

13   Q.   Okay.  Is there another investigation run by somebody else

14   that led to these charges?

15   A.   Yes.

16   Q.   Okay.  And how many investigations total run by different

17   people led to these charges?

18   A.   There was an investigation on each individual in this

19   room.

20   Q.   So there is a lead agent for each of the individuals in

21   this room?

22   A.   That's correct.

23   Q.   Okay.  For Kaleb only, who is lead agent in that

24   investigation?

25   A.   I don't have that information right offhand.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1   *Q.*   But you could get that readily, couldn't you?

2   *A.*   Yes.

3   *Q.*   Now, if there's a lead agent for each of the defendants in

4   this courtroom, then how does their work interrelate with your

5   work as the lead agent in the investigation you've mentioned?

6   *A.*   All the cases are tied together based on the association

7   with the subjects.  So oftentimes the same document or the same

8   information is tied to multiple individuals.  As such, that

9   information comes back and is provided to each case agent in

10  turn so they are aware of it.

11  *Q.*   Okay.  Is it fair to say that the case agents for the

12  individual defendants reported ultimately to you as the

13  investigation case agent?

14  *A.*   They don't report to me.  They provide the information to

15  me.

16  *Q.*   Okay.  And then you would be the person who worked

17  directly with the U.S. Attorney's Office on the charging

18  document and other matters?

19  *A.*   That's correct.

20  *Q.*   Okay.  So when you prepared the Complaint in this case --

21  I assume that you wrote portions of the Complaint.  Is that

22  fair?

23  *A.*   That's correct.

24  *Q.*   And did you get help from anyone?

25  *A.*   Provided details by the individual case agents and also

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    assistance in working with the U.S. Attorney.

2    *Q.*    Okay.  I'm not worried so much about what the

3    U.S. Attorney's Office did in wording things in the way they

4    thought was appropriate, but the information you used came in

5    large part from these other case agents.  Is that fair?

6    *A.*    That's correct.

7    *Q.*    So you had some information that you saw, right?

8    *A.*    That's correct.

9    *Q.*    And you used some of that information, right?

10   *A.*    Yes.

11   *Q.*    And then you used information that came from another case

12   agent or many other case agents, right?

13   *A.*    Correct.

14   *Q.*    And their information came from reports in part, right?

15   *A.*    Correct.

16   *Q.*    So what we have here is certainly a number of steps

17   between what is apparently observed and what ultimately gets to

18   you, right?

19   *A.*    That's correct.

20   *Q.*    Okay.  And then you draw conclusions from what you've

21   received and work with the U.S. Attorney's Office and put those

22   facts and conclusions into the Complaint.  Fair?

23   *A.*    I don't make conclusions, I only provide the facts that

24   are provided to me.  So I'm not making any conclusions based

25   upon those.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1  *Q.*   Okay.  You drew the conclusion, reached the conclusion

2  that there was probable cause to charge these people, right?

3  *A.*   That was not solely based upon me, it was based on all the

4  information.

5  *Q.*   Well, okay.  You signed an Affidavit that said "I believe

6  there's probable cause," right?

7  *A.*   That's correct.

8  *Q.*   Because you concluded that there was probable cause,

9  right?

10  *A.*   In conjunction with the U.S. Attorney, yes.

11  *Q.*   Well, are you saying that you weren't sure about probable

12  cause or are you saying you personally were sure about probable

13  cause?

14  *A.*   Um, I am not a lawyer by trade, so I do that in

15  coordination with the U.S. Attorney to determine that I have

16  met the probable cause standard.

17  *Q.*   Okay.  So when you drafted the Complaint -- and you've

18  incorporated that Complaint in your testimony here, right?

19  *A.*   That's correct.

20  *Q.*   Okay.  So, again, you had information from other case

21  agents, right?

22  *A.*   That's correct.

23  *Q.*   And you reviewed a lot of reports, right?

24  *A.*   Correct.

25  *Q.*   And you and others listened to many tape-recorded

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1  sessions, correct?

2  *A.*   Correct.

3  *Q.*   Now, just so I know, when you had a wire on say

4  Informant 2, CHS-2, was he recording in a device on his body or

5  was the conversation or whatever was picked up transmitted

6  somewhere else for recording?

7  *A.*   They were on his person.

8  *Q.*   Okay.  Did he have vehicles wired?

9  *A.*   Not that I'm aware of.

10  *Q.*   Okay.  Now, how about CHS-1?  And let me ask you, is CHS-1

11  the person from Wisconsin?

12  *A.*   Negative.

13  *Q.*   Okay.  CHS-1.  What recording did CHS-1 offer that you

14  relied upon in drafting the Complaint?

15  *A.*   Um, I don't know the exact recording.  It was provided to

16  agents out of a different division.  I don't know what the

17  device was.

18  *Q.*   Okay.  So when you say in the Complaint that you relied

19  upon recordings such as those from CHS-2 and CHS-1, you're

20  talking in part about recordings that you don't really know

21  about that were provided to agents in another jurisdiction,

22  right?

23  *A.*   That's correct.

24  *Q.*   Did you ever get transcripts of the recordings?

25  *A.*   I have not seen transcripts of that specific recording.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1  *Q.*   Okay.  Do you have transcripts of any of the recordings

2  done by any of the four people that you identified in the

3  Complaint?

4  *A.*   Transcripts have not been done at this point.

5  *Q.*   Okay.  Are they in process?

6  *A.*   I believe so.

7  *Q.*   Okay.  Now, you've got recordings -- let's just focus on

8  the two CHS witnesses.  You've got recordings from each of

9  them.  Do you know or do you have an estimate of about how

10  many hours their tapes consist of?

11  *A.*   I -- I don't.  It's a substantial amount.

12  *Q.*   Okay.  Are we talking -- again, only to the extent you can

13  estimate -- more than a hundred hours do you think?

14  *A.*   I would estimate, yes.

15  *Q.*   And out of that hundred-plus hours you have selected

16  certain passages or quotations from the various defendants here

17  to include in the Complaint, right?

18  *A.*   That's correct.

19  *Q.*   Okay.  Now, in regard to -- in regard to -- going back to

20  your training and your work in the counter-terrorism area.

21  Again, you've learned a lot about militias or militia groups or

22  similar groups as part of that training and your work

23  experience, right?

24  *A.*   That's correct.

25  *Q.*   And it's fair to say, isn't it, that when you evaluate

CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM

1    these people based upon this training and experience you see

2    some people who are leading the way to trouble occasionally and

3    some people who are followers.  Is that fair?

4    A.   That's correct.

5    Q.   And the people who are -- that you would label as

6    followers are sometimes in your experience serious about being

7    involved and sometimes they aren't serious.  Is that fair?

8    A.   That's a fair assessment.

9    Q.   Okay.  And there are times when these people say things

10   that are -- these followers say things that are very

11   inconsistent with crimes.  You've seen that happen, right?

12   A.   That's correct.

13   Q.   And you've seen that happen in this case, haven't you?

14   A.   Are you referring to something specific?

15   Q.   Well, you've -- let me ask the question:  Have you seen

16   any of the named defendants in this case as part of your

17   investigation make statements that are inconsistent with

18   criminal activity or criminal intent?

19   A.   We have had a couple of statements, yes.

20   Q.   For example, at some point in your investigation you

21   determined that Kaleb said he was not okay with kidnapping.

22   You got that information, didn't you?

23   A.   That's correct.

24   Q.   And you got some other information from other defendants

25   that they weren't interested or willing to do certain criminal

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1  acts, right?

2  A.   That's correct.

3  Q.   The information you got that would fall in this category,

4  people who said they weren't interested, that came from people

5  who you would call followers, right?

6  A.   I don't necessarily know that I would classify them as

7  followers.

8  Q.   Well, in this case -- in this case you identified very

9  clearly who the leaders were, right?

10  A.   That's correct.

11  Q.   And you didn't identify Kaleb as a leader, did you?

12  A.   Correct.

13  Q.   One of the most active leaders was your informant, wasn't

14  it?

15  A.   Our informant was involved in the group, yes.

16  Q.   Well, but your informant, when we listen to the

17  recordings, we're going to hear, aren't we, that your informant

18  was pushing people like Kaleb to do things that were criminal?

19  We're going to hear that, aren't we?

20  A.   I would not say our informant is pushing people to do

21  things of criminal nature, but they are having discussions,

22  yes.

23  Q.   Okay.  So the question of whether or not your informant --

24  okay.  Let me withdraw that.

25       So clearly you did identify some leaders, people you

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    thought were leaders, right?

2    A.    Correct.

3    Q.    And you've said Kaleb was not one of them, right?

4    A.    Correct.

5    Q.    The leaders that you identified were pushing people to

6    take action, right?

7    A.    They discussed with the group, but I don't believe there

8    was always a pushing in general.

9    Q.    No.  Okay.  Well, you just said you don't believe that

10   there was always a pushing in general.  Were there times when

11   these people, when these leaders would push followers to do

12   something?  Times?  Occasions?

13   A.    Occasions, yes.

14   Q.    Okay.  And your informant was one of the people pushing on

15   some of these occasions, right?

16   A.    I would not say that's an accurate statement.

17   Q.    Okay.  So you're saying today that when we listen to the

18   tapes we'll hear some people pushing occasionally, but your

19   informant was not one of them.  Is that fair?

20   A.    I can't speak to all the tapes.  As you mentioned, there

21   are a number of tapes.  So -- but as of the tapes that I have

22   listened to, I cannot accurately say that the informant was

23   pushing individuals to do stuff.

24   Q.    Well, okay.  Are you saying that you have concluded that

25   the informant didn't push or you're just saying "I'm not sure"?

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    *A.*   I can't speak to tapes that I have not listened to at this

2    time.

3    *Q.*   Okay.  Let's just talk about the tapes that you have

4    listened to.  Have you heard the informant pushing people to

5    take criminal action?

6    *A.*   I cannot think of anything off the top of my head at this

7    time.

8    *Q.*   Okay.  Okay.  Now, in regard to the tapes you've listened

9    to or not listened to, I mean, give me your best idea of the

10   percentage of the overall tapes that you've listened to.

11   *A.*   I couldn't even begin to speculate on the percentage-wise.

12   I've listened to a substantial amount, but there are

13   substantially more to listen to.

14   *Q.*   Sure.  And -- okay.  We're just talking generally.  There

15   could be a hundred hours you've never listened to.

16   Possibility, right?

17   *A.*   Possibility, yes.

18   *Q.*   Now, in regard to -- let's talk about CHS-2.  When he came

19   forward were you involved in the first contacts with him?

20   *A.*   I was not.

21   *Q.*   Okay.  Who did he first have contact with?

22   *A.*   It would have been the local police department.  It was an

23   individual that lived down the street from him.

24   *Q.*   Okay.  Okay.  So the thing I want to make sure I'm clear

25   about from the Complaint is this:  It indicates at some point

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1   that someone became concerned about what a group was talking

2   about and then the Complaint flips to statements by CHS-2.  Was

3   CHS-2 the person who first alerted law enforcement to a

4   situation that started this investigation or was it somebody

5   else?

6   A.   CHS-2 was first alerted based on members of the

7   Wolverine Watchmen, in that group specifically.

8   Q.   I understand.  But when law enforcement was first

9   contacted by someone who said "I don't condone what they are

10  talking about so I'm coming forward," was that CHS-2 or

11  somebody else?

12  A.   That was CHS-2, yes.

13  Q.   Okay.  It's just a point of clarification for me.

14  A.   All right.

15  Q.   Now, how long had CHS-2 been working with law enforcement

16  before you first talked with him?

17  A.   I have not directly spoken with CHS-2.

18  Q.   Okay.  Did you ever give instructions to anyone for CHS-2?

19  Things like he should do this, he should do that, he should

20  push this, he should ask this, anything like that?

21  A.   I did not.

22  Q.   Did others give instructions to CHS-2?

23  A.   I can't speak for others, but I would assume so, yes.

24  Q.   Okay.  Well, is there a counter-terrorism protocol for

25  working with an informant and trying to give them instructions

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    to get information?

2    A.   Yes, it should be documented.

3    Q.   There is a protocol?

4    A.   Yes.

5    Q.   And is it written?

6    A.   The protocol or what was given to the --

7    Q.   No.   Is there a written FBI protocol for instructions to

8    be given to an informant who is working in the middle of an

9    investigation?

10   A.   Um, we have several policies for running counter-terrorism

11   investigations and also for running human sources.

12   Q.   Okay.   And do you believe that the FBI policies for

13   running human sources were applied and followed in this case?

14   A.   Yes, I do.

15   Q.   And is that because other agents have told you that?

16   A.   Yes.

17   Q.   Okay.   So you haven't talked with CHS-2, but you've talked

18   with the agents who were actually working CHS-2, right?

19   A.   That's correct.

20   Q.   And they were the ones who would give him the instructions

21   about what to do, what to say as part of his work for you,

22   right?

23   A.   That would be correct.

24   Q.   Okay.   And part of that instruction through the protocol

25   is to encourage people to talk about and act on criminal ideas,

CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM

1    right?

2    A.    I don't believe that is explicitly explained in the manual

3    in that way.

4    Q.    Okay.  Okay.  But there is a manual that we can take a

5    look at and the manual will speak for itself.  Is that fair?

6    A.    Yes.

7    Q.    Okay.  CHS-2 got expense money from you, right?

8    A.    Not from me specifically.

9    Q.    Well, I'm sorry, from the FBI.

10   A.    That's correct.

11   Q.    Did he get any kind of reward money?

12   A.    From the handling agents I was told that, no, it was only

13   for expenses.

14   Q.    Okay.  Is CHS-2 eligible for an FBI reward for his work

15   here?

16   A.    I do not have any information on that.

17   Q.    Okay.  Do you have -- does that happen from time to time?

18   A.    It does in some cases, yes.

19   Q.    Okay.  So are you saying that in this case it's a

20   possibility but you just don't know?

21   A.    I can't speculate whether it would happen or not.

22   Q.    Okay.  Are you aware of the criteria or the criteria for

23   receiving rewards for acting as a confidential informant?

24   A.    I am not.

25   Q.    Do you know if the reward procedure -- I'll call it that,

CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM

1   it may not be formal -- is something that's reduced to writing?

2   Do you know that?

3   A.   I have not been involved in that process, so I'm not aware

4   of that.

5   Q.   Now, ultimately the information you received indicated, as

6   I understand it, that the governor would be kidnapped and would

7   either be put on trial or would be left in the middle of

8   Lake Michigan in a boat, correct?

9   A.   That was -- yes, that was two of the options.

10  Q.   Well, did any -- okay.  When you made the decision to --

11  when I say you, law enforcement as a whole -- made the decision

12  to file the Complaint and make the arrests on October 7, you

13  weren't really sure what you thought the group intended, were

14  you?

15  A.   That's not correct.

16  Q.   Okay.  You did not have a theory that they were going to

17  put her in a boat at that time, did you?

18  A.   We had seen conversations to that effect, yes.

19  Q.   Before -- before you talked with any of the defendants in

20  this case you had some information about that?

21  A.   That's correct.

22  Q.   And you had information that she was going to be put on

23  trial?

24  A.   That's correct.

25  Q.   One possibility.  And where was she going to be tried?

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    A.   There were multiple suggestions.  One was Wisconsin.

2    Q.   Okay.  Where else?

3    A.   They had discussed several ideas about taking her to a

4    different state and -- but they weren't sure where.  They

5    didn't mention other specific states.

6    Q.   Okay.  When you say "they," you are not talking about

7    Kaleb, are you?

8    A.   I don't recall who was involved in those discussions at

9    that time.

10   Q.   Well, you can't say to the Court today that you have

11   information that Kaleb made a statement regarding where she

12   should be tried, can you?

13   A.   I can't without reviewing the -- reviewing the chats.

14   Q.   Well, you don't remember ever seeing him say that, do you?

15   A.   I don't recall at this time.

16   Q.   Okay.  Where else did people talk about trying her?

17   A.   As I said, they had tossed the idea about going to

18   different states.  There was no specific places that were

19   mentioned.

20   Q.   So the real concern that law enforcement had was that

21   there might be a kidnapping, right?  I mean, regardless of what

22   step 2 was, a kidnapping of the governor?

23   A.   That's correct.

24   Q.   I certainly understand that.  I certainly understand that.

25   But a big part of what you did to act on this Complaint was to

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    make certain that something as serious as that never happened.

2    That was a big part of it, wasn't it?

3    A.   Ensuring that the kidnapping did not occur, yes.

4    Q.   Sure.  It was preempted, if you will, just to be certain

5    that something so serious could not happen.

6    A.   That's correct.

7    Q.   Okay.  And -- okay.  I'm just -- I'll tell you, because

8    I've looked at things, I've heard the Michigan Attorney General

9    say "I'd rather have a weak conspiracy case than a strong

10   homicide."  And you agree with that, don't you?

11   A.   I don't necessarily know that I -- I don't know what the

12   Attorney General said, so . . .

13   Q.   I'm just telling you, if she said that, you would agree

14   with that sentiment, wouldn't you?

15   A.   I would have to take some time to think about it.

16   Q.   The statement "I would rather have a weak conspiracy

17   case" --

18             MR. KESSLER:  Your Honor, I'm going to object to the

19   relevance.

20             THE COURT:  Mr. Graham.

21             MR. GRAHAM:  Well, I'm trying to get to the point of

22   preemptive action by the government without knowing that it had

23   a strong conspiracy case.

24             THE COURT:  Well, I mean, you can ask him whether he

25   thought his case was strong, but I don't know that he can

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1   interpret the Attorney General's statement.

2          *MR. GRAHAM:*  I understand, Your Honor.  But if I make

3   a statement to him -- let's just talk about the hypothetical

4   statement "I would rather have a -- I would rather have a weak

5   conspiracy case than a strong homicide."  It doesn't matter who

6   said it.

7          *THE COURT:*  You can ask him the question, but I think

8   he got kind of off-track on whose statement he had to interpret

9   there.

10         *MR. GRAHAM:*  Sure.  I'm sorry.

11  *Q.*  *(BY MR. GRAHAM)*  Let me ask you and see what the Court

12  says.  Just the statement "I would rather have a weak

13  conspiracy case" --

14         *MR. KESSLER:*  Again I object, Your Honor.

15  *Q.*  *(BY MR. GRAHAM)*  -- "than a strong homicide."

16         *THE COURT:*  I mean, I think the question would be --

17  I'm not exactly sure what you're trying to get at here in terms

18  of the --

19         *MR. KESSLER:*  Your Honor, he's trying to get at

20  saying -- trying to get in here somehow that the

21  Attorney General thinks this is a weak case, which --

22         *THE COURT:*  Well, which as I recall she didn't

23  either, so . . .

24         *MR. KESSLER:*  If she even does.

25         *THE COURT:*  So, Mr. Graham, I think you have to move

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1  on.

2  Q.  *(BY MR. GRAHAM)*  Part of the reason you acted on the 7th

3  was because you wanted to preempt any possibility of a plan

4  actually going forward, right?

5  A.  That's correct.

6  Q.  Because of the seriousness of the plan, correct?

7  A.  That's correct.

8  Q.  Because as you said, you can't tell exactly what

9  someone -- you can't read minds about their intent, right?

10  A.  Not that I'm aware, sir.

11  Q.  But you were concerned enough about the possibility of

12  intent that you went forward on the 7th?  Fair?

13  A.  That's correct.

14  Q.  Okay.  I want to ask you some questions about the aspect

15  of your investigation that related to the possibility of

16  blowing up a bridge.  Okay?

17      Now, as I understand it, the investigation determined, you

18  determined, that there was talk and possible intent to blow up

19  a bridge.  A bridge, right?

20  A.  Correct.

21  Q.  Primarily to slow a law enforcement response to a

22  kidnapping, right?

23  A.  Correct.

24  Q.  And you talked about the fact that some explosives had

25  been discharged at some of the tactical training, right?

CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM

1   A.   Correct.

2   Q.   What do you know about the explosive strength of these

3   IEDs that were exploded?

4   A.   I am not an explosive expert, so I cannot answer those.

5   Q.   Okay.  They were IEDs kind of made from firecrackers,

6   weren't they?

7   A.   Other materials.  Not just firecrackers.

8   Q.   Well, it started with firecrackers and built off that.

9   Fair?

10  A.   It was a portion of the device that I understand.

11  Q.   And you put an FBI agent in the mix.  That was Red, right?

12  A.   Correct.

13  Q.   Now, Kaleb never said anything about explosives, did he?

14  A.   I would have to review everything to see if he actually

15  said anything.

16  Q.   Are you able to tell Judge Berens today that you have any

17  information -- whether personal, firsthand, or whether

18  fifthhand, hearsay -- any information today that Kaleb was

19  involved in explosives?

20  A.   I would have to look through the information to say that.

21  Q.   No, I asked you.  Do you have any information today that

22  you can give to Judge Berens -- regardless of how many levels

23  it's removed from you -- do you have that information today

24  indicating that Kaleb was involved in explosives?

25  A.   And, again, there are a lot of factors in this

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    investigation, a lot of information.  I would have to review

2    the case to make that statement one way or another.

3    *Q.*   Well, you don't have that information today, do you?

4    *A.*   I don't have that right in front of me.

5    *Q.*   What you're saying -- well, but what you're saying is you

6    have no idea because you have to go back and review the

7    reports, right?

8    *A.*   I would have to review the reports to make an assessment

9    on that one way or another.

10   *Q.*   I understand.  But as of today -- we're talking about

11   what's the evidence today.  And there isn't any, is there, that

12   Kaleb was involved?

13   *A.*   I can't answer that there is no evidence today because --

14   *Q.*   You can't tell Judge Berens what that might be if there is

15   any.  Is that fair?

16   *A.*   I can't explain something that I have not seen.

17   *Q.*   What I'm asking you is as of today can you tell

18   Judge Berens that you are aware of information indicating that

19   Kaleb was involved in explosives?  I understand what you might

20   go back and find.  As of today as we sit here on your

21   Complaint, can you say that part of that is information that

22   Kaleb was involved in explosives?

23   *A.*   As of this moment, without having further information, I

24   cannot say that.

25   *Q.*   Sure.  Understood.  So as we sit here today on your

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    Complaint and on the question of whether they should be held on

2    the charge, there isn't any that you know of.  Fair?

3    A.   On the charge of kidnap?

4    Q.   On explosives and Kaleb.

5    A.   On the explosives, but we're not charging with explosives

6    currently.  So you're asking about explosives.

7    Q.   I'm asking you about explosives.  That's part of your

8    testimony on direct, wasn't it?

9    A.   Yes.

10   Q.   I mean, part -- a big component of your testimony was that

11   people were working on explosives because part of the plan was

12   going to be to slow law enforcement, right?

13   A.   That's correct.

14   Q.   So I'm asking you about those explosives.  That explosive

15   component of your testimony had nothing to do with Kaleb, did

16   it?

17   A.   Kaleb was part of the surveillance.

18   Q.   The explosive -- when you talk about explosives, people

19   pulling together IEDs, people going to a bridge, looking under

20   the bridge, people specifically talking about what will happen

21   if we blow up the bridge, none of that came from Kaleb, did it?

22   A.   His verbal words.  He was present during the explosives at

23   the training in September, so he was present during that time.

24   His verbal statements I cannot recall, and I don't have access

25   to that at this time.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1  *Q.*  Okay.  So he was -- he was in Leroy.  That's the evidence,

2  right?

3  *A.*  Pardon?

4  *Q.*  He was in Leroy and explosives were discussed.  That's the

5  point, right?

6  *A.*  Luther.

7  *Q.*  I'm sorry.  I'm sorry, Luther.  My mistake.  He was in

8  Luther and things were discussed?

9  *A.*  That's correct.

10  *Q.*  Okay.  And that's it.  Right?  That's it as of today?

11  *A.*  As of this time from what I can recall, yes.

12  *Q.*  Okay.  Now, when you testified in response to

13  Mr. Kessler's questions you talked often about what they said.

14  You used the word "they."  Talking about a group of people that

15  I think were involved in chats mostly, right?

16  *A.*  Correct.

17  *Q.*  People who were involved in chats or people who attended

18  tactical training.  Is that fair?  I don't want to -- it's no

19  trick question.

20  *A.*  Correct.

21  *Q.*  When you talked about "they," you're kind of saying if one

22  knew -- I mean, the gist of it is, you're saying if one knew,

23  you think all of them knew.  Is that fair?

24  *A.*  Ah, yes, I would assume.

25  *Q.*  Okay.  But you know, don't you, that from the

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1   communications, say the wired, the recorded conversations, and

2   other intelligence that you have and evidence you have, you

3   know that there were thousands of communications between

4   individuals in the group and -- that had nothing to do with the

5   group as a whole?  Just basic communication, right?

6   A.   That's correct.

7   Q.   Out of these thousands of communications we've culled out

8   eight or 10 and put them in the Complaint, right?

9   A.   Correct.

10  Q.   Okay.  When people talked about kidnapping the governor

11  and putting her on trial somewhere, Wisconsin, other states

12  that you've mentioned, did anyone ever talk about how they were

13  going to transport her from the kidnapping site to the location

14  of trial?

15  A.   Yes.

16  Q.   Okay.  Who talked about that?

17  A.   Um, Adam Fox I believe had that conversation with another

18  individual.

19  Q.   Okay.  Who is that other individual?

20  A.   One of the state individuals.

21  Q.   Okay.  Which one?

22  A.   Shawn Fix.  I know of at least one conversation that that

23  occurred during.

24  Q.   Okay.  And was that conversation tape-recorded?

25  A.   We had a UCE present.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1  Q.   Okay.  So it wasn't tape-recorded, but one of your agents

2  heard the conversation.  Is that fair?

3  A.   That's correct.

4  Q.   Okay.  And what did they say about how they were going to

5  transport her?

6  A.   Um, they had discussed taking her by boat out into the

7  middle of the lake.

8  Q.   Okay.  But that's not taking her to another state.  I

9  wasn't clear on my question.

10  A.   Correct.

11  Q.   You talk about people saying we're going to take her to

12  Wisconsin or to another state and put her on trial, right?

13  A.   Correct.

14  Q.   You had that information.  Do you have any information

15  about how they were going to transport the governor of Michigan

16  from her summer home to another state so that they could put

17  her on trial?  Any planning or discussion about that?

18  A.   I don't recall that at this time.

19  Q.   Okay.  You had your two UCEs in the case and one was Red,

20  right?

21  A.   That's correct.

22  Q.   Was he 1 or 2?  Designated as 1 or 2?

23  A.   I don't recall offhand which one.

24  Q.   Okay.  The other UCE, what name was he using during the

25  operation?

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1    A.    He was going by Mark.

2    Q.    Okay.  And how does he fit in?  I mean, you indicate in

3    the Complaint that the information came from him.  Where did he

4    gather the information that he gave to you that you used in the

5    Complaint?

6    A.    Firsthand knowledge from meetings and also from recorded

7    conversations.

8    Q.    And did Mark record any conversations?

9    A.    Yes.

10    Q.    Okay.  Is Mark designated as a person from Wisconsin?

11    A.    No.

12    Q.    Okay.  When he was involved in meetings and did this

13    recording, was it in the state of Michigan or elsewhere?

14    A.    There were both in Michigan and elsewhere.

15    Q.    Okay.  What other states?

16    A.    Wisconsin I can recall right offhand.

17    Q.    Okay.  CHS-1, how did you verify his reliability or

18    credibility?

19    A.    The handling agents verified that.

20    Q.    How did they do it?

21    A.    I can't speak to that at this time.

22    Q.    Okay.  But your Complaint says that you verified that he

23    was reliable.

24    A.    This is --

25    Q.    You're going strictly off the word of someone who told you

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1  that?

2  A.   This is based on multiple agents and their reporting, yes.

3  Q.   But you can't tell me what they did.  Is that fair?

4  A.   I don't have that information in front of me.

5  Q.   CHS-2, what did you do to establish his reliability and

6  credibility?

7  A.   Again, that was from the handling agents and based on

8  seeing confirmation from information provided.

9  Q.   Okay.  So, again, that comes from other people who told

10  you he's credible and it goes into the Complaint, right?

11  A.   That's correct.

12  Q.   Okay.  When the decision was made to conduct the arrests

13  on October 7, that was based in part on conversations that

14  discussed Red coming through town, correct?

15  A.   That was the scenario set up for that.

16  Q.   Okay.

17  A.   That meeting, yes.

18  Q.   Okay.  And you're aware of discussions that occurred

19  between Red and others about him coming through, right?

20  A.   Yes.

21  Q.   And you talked about those, right?

22  A.   Correct, correct.

23  Q.   And you talked about he's bringing gear and something

24  else.  But gear was talked about, wasn't it?

25  A.   Based on the messages that we reviewed, yes.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM*

1   *Q.*   Sure.  Gear would be tactical gear and then whatever else

2   was referred to you thought would be explosives, right?

3   *A.*   I believe it actually referred to the order that was

4   placed at the last FTX.

5   *Q.*   Okay.  When there was talk about him having gear,

6   returning gear, it was gear that he had picked up at the last

7   tactical, wasn't it?

8   *A.*   Yes.

9   *Q.*   Okay.  And you knew that people like Kaleb were very

10  interested in gear, right?

11  *A.*   I did not know that specifically.

12  *Q.*   You haven't determined in the course of the investigation

13  that Kaleb is very interested in military-type gear and

14  military-style weapons?

15  *A.*   I can make an assumption, yes.

16  *Q.*   Okay.  So what you're saying is you don't know, but based

17  on your experience it certainly makes sense to you.  Is that

18  fair?

19  *A.*   Yes.

20  *Q.*   Okay.  And based upon that same experience you would

21  assume that if Red is bringing gear through, Kaleb would be

22  interested in it, right?

23  *A.*   Potentially, yes.

24  *Q.*   Okay.  You had -- you've quoted statements made by Kaleb

25  on the way back from the surveillance, and you've indicated in

CROSS-EXAMINATION OF RICHARD TRASK BY MR. GRAHAM

1    the Complaint there were three people in the car.  A person

2    from Wisconsin and then two of the people here, Kaleb being

3    one.  Was the person from Wisconsin in the car an informant for

4    you?

5    A.   I don't recall right offhand if that was the case, but I

6    don't believe so.

7    Q.   If you have included in your Complaint statements by any

8    of the defendants that you've put in quotation marks, would

9    that be a specific statement that had been recorded?

10   A.   Yes.

11   Q.   Okay.  So if there are such marks, you would assume that

12   they came right from a tape?

13   A.   It would either be on the tape or via the text-message

14   strings --

15   Q.   Okay.

16   A.   -- in the encrypted apps.

17   Q.   What I'm getting at is this:  If an informant simply told

18   you that this was said, you just wouldn't quote them, you would

19   say "This was said"?

20   A.   That's correct.

21   Q.   Okay.  You talked during your testimony about activities

22   that occurred at the Vac Shack on South Division.  Do you

23   remember?

24   A.   Yes.

25   Q.   Okay.  And certainly that location was very important to

1    the investigation.   Fair?

2    A.    It was one of the locations, yes.

3    Q.    I understand.   There were many others, but that one was

4    important, correct?

5    A.    Correct.

6    Q.    And you have reviewed information regarding who was there,

7    who wasn't there, and you have some recordings about things

8    that happened.   Is that fair?

9    A.    Correct.

10   Q.    You have no evidence that Kaleb was ever there?

11   A.    I would have to review my notes, but I don't believe he

12   was.

13   Q.    Okay.   And you certainly are not telling Judge Berens that

14   you know that he was there as of today?

15   A.    That's correct.

16   Q.    Okay.

17            MR. GRAHAM:   Thank you, Judge.   I'm good for right

18   now.

19            THE COURT:   Thank you.   Unless the government

20   objects, I think it makes sense to just have each defendant do

21   their cross-examination and then let you do some redirect.

22            MR. KESSLER:   That's fine, Your Honor.

23            THE COURT:   All right.   Mr. Douglas.

24            MR. DOUGLAS:   Thank you, Your Honor.

25            Before I forget, Your Honor, I would make the same

CROSS-EXAMINATION OF RICHARD TRASK BY MR. DOUGLAS

1    motion for -- under 26 too for the same information.

2             THE COURT:  It's granted, and I assume Mr. Kessler

3    has copies for everybody.

4             MR. KESSLER:  (Handing).

5             MR. DOUGLAS:  Thank you.

6             MR. KESSLER:  I'm handing that to counsel right now.

7             MR. DOUGLAS:  Thank you, Mr. Kessler.

8             MR. KESSLER:  You're welcome.

9                       CROSS-EXAMINATION

10   BY MR. DOUGLAS:

11   Q.   Good afternoon, Agent Trask.

12   A.   Good afternoon.

13   Q.   I'll try not to go over any -- anything that we've

14   already -- we've already covered.

15        I wanted to go back to your training a little bit now.

16   Were you ever given training on interpreting text messages?

17   A.   Not specifically, no.

18   Q.   So you've never been -- you've never been given any

19   training that taught you how to read tone in a text message?

20   A.   No, I have not.

21   Q.   You have no other linguistic training?

22   A.   No.

23   Q.   Okay.  And you mentioned some were considered leaders and

24   some not.  Mr. Harris wasn't considered a leader, correct?

25   A.   He was not listed as a leader at any point that I'm aware

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. DOUGLAS*

1    of.

2    Q.   Okay.  Thank you.

3         And we talked about FTX goods.  Those could be -- those

4    could be, based on what you've read, anything.  Sometimes they

5    were medical supplies; isn't that correct?

6    A.   I'm sorry, what are you referencing?

7    Q.   FTX materials.  Or FTX goods.

8    A.   I'm not quite understanding.  So an FTX is the field

9    training exercises.  I'm not sure what you're referencing.

10   Q.   Sure.  And prior counsel asked about goods versus

11   explosives.  I think he was recalling the last conversation.

12   But there were times when they discussed materials for FTX that

13   weren't explosives; isn't that correct?

14   A.   Yes.

15   Q.   Those could be vests?

16   A.   Yes, I would assume.

17   Q.   Belts?

18   A.   Yes.

19   Q.   Any number of things that weren't explosives or guns;

20   isn't that correct?

21   A.   That's correct.

22   Q.   And on the last message going -- that we've reviewed, that

23   talked about explosives, there was never any money delivered

24   for that, was there?

25   A.   Yes, several had brought cash to the October 7th meeting.

CROSS-EXAMINATION OF RICHARD TRASK BY MR. DOUGLAS

1    Q.   But Mr. Harris did not?

2    A.   I can't confirm at this time.

3    Q.   Okay.  And when we were reviewing some of the text

4    messages sent out, we saw, you know, many times where there

5    would be a number of people that were listed, correct?

6    A.   That's correct.

7    Q.   But not everybody who was listed, i.e. receiving the

8    messages, responded to those messages; isn't that correct?

9    A.   That's correct.

10   Q.   So sometimes we don't know if they were passive listeners

11   or whether they didn't hear anything at all if they didn't

12   respond; isn't that correct?

13   A.   That's correct.

14   Q.   We would have no way of knowing whether they were a party

15   to those text messages?

16   A.   Correct.

17   Q.   Now, just on specific dates.  You mentioned the meeting in

18   June in Dublin, Ohio, correct?

19   A.   Yes.

20   Q.   Mr. Harris wasn't there, right?

21   A.   I apologize, I would have to review my notes to recall

22   that.

23   Q.   But you don't recall that he was there?

24   A.   Right offhand I don't recall.

25   Q.   And you don't have -- you don't have any recollection that

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1    he was ever in the basement at the Vac Shack, right?

2    *A.*    No, I don't have any recollection.

3    *Q.*    So as far as you know right now he wasn't there?

4    *A.*    That's correct.

5    *Q.*    And in the meetings on July 10th and 12th Mr. Harris

6    wasn't there?

7    *A.*    That was the training in Munith; is that correct?

8    *Q.*    That's correct.

9    *A.*    I don't recall offhand.

10    *Q.*    Okay.  But it's your --

11           *THE COURT:*  Counsel, which date were you asking about

12    that time?

13           *MR. DOUGLAS:*  It was July 10th through 12th.

14           *THE COURT:*  Thank you.

15    *Q.*    *(BY MR. DOUGLAS)*  And for the August 29th date Mr. Harris

16    wasn't there either, was he?

17    *A.*    That's correct.

18    *Q.*    And for the September 12th and 13th, you don't --

19    Mr. Harris was not involved in any of those surveillance

20    exercises?

21    *A.*    He did not attend the surveillance.

22           *MR. DOUGLAS:*  I have no more questions, Your Honor.

23           *THE COURT:*  Thank you.

24           Mr. Hills.

25

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1                           CROSS-EXAMINATION

2    *BY MR. HILLS:*

3    *Q.*   I want to follow up on CHS-1 and CH2 for a moment if I

4    can.  I believe you were asked about CHS-2 and any payments

5    that that individual received, and you indicated he received

6    money for expenses; is that correct?

7    *A.*   That's correct.

8    *Q.*   But he did not receive any money for his time let's say;

9    is that right?

10   *A.*   That's how I understand it, yes.

11   *Q.*   And he hasn't -- there hasn't been a reward given yet at

12   this time?

13   *A.*   Not that I'm aware of.

14   *Q.*   CHS-1 I don't believe you talked about.  CHS-1 was given

15   some money; is that right?

16   *A.*   That's correct.

17   *Q.*   And he was given money for expenses, correct?

18   *A.*   That's correct.

19   *Q.*   But he was also given money for his time; is that correct?

20   *A.*   I'm not completely sure on that at this time.

21   *Q.*   Okay.  So he might have been given some extra money over

22   and above his expenses; is that right?

23   *A.*   That's possible.

24   *Q.*   All right.  And you don't know how much that could have

25   been sitting here today?

1    *A.*    I'm not aware of that.

2    *Q.*    All right.

3            *MR. HILLS:*  Now, I suppose I need to make a motion on

4    Rule 26 too, but the government has already given me the

5    documents.

6            *THE COURT:*  All right.

7            *MR. HILLS:*  So we'll get that out of the way.

8    *Q.*    *(BY MR. HILLS)*  Mr. Caserta was not designated as a leader

9    of any kind; is that right?

10   *A.*    Not that I'm aware of.

11   *Q.*    All right.  And the first time that Mr. Caserta appears is

12   June 28th at the Munith location; is that correct?

13   *A.*    I believe if I recall correctly, yes.

14   *Q.*    Before that there's no information about him; is that

15   right?

16   *A.*    Not that I have reviewed.

17   *Q.*    Okay.  And he was not associated with any type of militia

18   as we've discussed that you were aware of?

19   *A.*    Not that I'm aware of.

20   *Q.*    Now let's just talk about this Munith FTX if we can for a

21   moment.  FTX is a training, and you've testified that these are

22   common trainings within Michigan, across our nation; is that

23   right?

24   *A.*    That's correct.

25   *Q.*    Now, this was one of those, and it was attended by a lot

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1    of people; is that correct?

2    A.    Correct.

3    Q.    Any estimation?  Forty, 50 people?

4    A.    I don't have that current number.

5    Q.    You've seen some videos of it; is that right?

6    A.    Yes.

7    Q.    And there are many, many people above and beyond the

8    people that you've identified in this Complaint; is that

9    correct?

10   A.    That's correct.

11   Q.    And we watched a video that had Mr. Caserta in it; is that

12   right?

13   A.    That's correct.

14   Q.    And in that video they were doing an exercise; is that

15   right?

16   A.    Yes.

17   Q.    Getting out of a vehicle and shooting guns; is that right?

18   A.    That's correct.

19   Q.    Now, that's one of those common things that they do at

20   these trainings?

21   A.    Vehicle egress is not a common theme that we see at these

22   trainings.

23   Q.    But you've seen it before?

24   A.    I have.

25   Q.    And there's nothing illegal about it?

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1   A.   No, there's not.

2   Q.   And there's nothing illegal about the gun that Mr. Caserta

3   had at that time; is that right?

4   A.   Not that I'm aware of.

5   Q.   And regarding that training, CHS-2 was there; is that

6   right?

7   A.   Yes.

8   Q.   CHS-2 was actually directing that training that we had

9   seen on the video; is that right?

10   A.   I believe portions of it CHS-2 did.

11   Q.   So the undercover was coordinating and putting forth the

12   individuals to do this training that you say is not as common?

13   A.   I don't know his specific role in that.

14   Q.   Okay.  But he was leading that particular training?

15   A.   He could have been a range safety officer or somebody of

16   that position.  I can't speculate at this time.

17   Q.   Okay.  So they had range safety officers and other people

18   who were teaching how to do these tactics; is that right?

19   A.   Different people would run different types of training

20   throughout the weekend or during the training events, yes.

21   Q.   Right.  So certain people were in charge of training other

22   people?

23   A.   That's correct.

24   Q.   And Mr. Caserta was being trained?

25   A.   In the video, yes.

CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS

1    Q.    By CHS-2?

2    A.    I don't know that.  Again, I don't know CHS's role in

3    that, in the training.

4    Q.    Okay.  Now, Mr. Caserta was then in Wisconsin July 10th

5    through the 12th; is that right?

6    A.    I believe so, yes.

7    Q.    And that was another one of these trainings; is that

8    correct?

9    A.    That's correct.

10   Q.    And again there are multiple people, 50-plus people at

11   these events?

12   A.    I don't know that there were over 50, but, yes, there were

13   multiple people.

14   Q.    There were a lot more people than are named here; is that

15   right?

16   A.    That's correct.

17   Q.    And at that -- and let's just talk about for a moment -- I

18   think you already did -- but there are multiple different kinds

19   of trainings at these events; is that right?

20   A.    Correct.

21   Q.    So the getting out of a car and shooting would be one type

22   of training; is that right?

23   A.    Potentially, yes.

24   Q.    There's medical training for -- to apply tourniquets and

25   that kind of thing.  First aid.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1   A.   Yes, potentially.

2   Q.   All right.  And there's long-distance shooting; is that

3   right?

4   A.   Again, potentially, yes.

5   Q.   Up-close with pistol shooting; is that right?

6   A.   Potentially, yes.

7   Q.   Multiple different groups going on at the same time; is

8   that right?

9   A.   Potentially.

10  Q.   And some of these have potlucks; is that right?  You eat

11  and have -- mingle with other individuals at the training?

12  A.   Yeah, that's correct.

13  Q.   And people camp out, right?

14  A.   At some of them, yes.

15  Q.   And at apparently this one there was a quote-unquote IED;

16  is that right?

17  A.   That's correct.

18  Q.   And it was attempted to be exploded but it failed; is that

19  correct?

20  A.   That's correct.

21  Q.   This one was the balloon with the BBs in it; is that

22  right?

23  A.   Yes.  That's correct.

24  Q.   And Mr. Caserta did not put together this BB balloon IED,

25  did he?

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1    *A.*    Not that I'm aware of.

2    *Q.*    And you don't even know if he was present at all when this

3    was being put together?

4    *A.*    Correct.

5    *Q.*    You don't -- he wasn't there when this thing was attempted

6    to be exploded?

7    *A.*    I don't know that information.

8    *Q.*    He didn't bring any, any of the components, the BBs or the

9    balloons or a fuse or whatever was used?

10   *A.*    Not that I'm aware of.

11   *Q.*    And if it's July 10, 11th, 12th, three days, multiple

12   people, many different areas being used for different types of

13   programming, correct?

14   *A.*    Potentially, yes.

15   *Q.*    While we're on this explosive -- explosions, I believe you

16   testified on direct that there was some code language that you

17   talked about, talked about a baker, talked about cakes, talked

18   about cupcakes.  Do you recall?

19   *A.*    Yes.

20   *Q.*    All right.  Mr. Caserta was never a part of any of that,

21   he never said any of those things; is that correct?

22   *A.*    I would have to review the messages, but I don't recall at

23   this time.

24   *Q.*    Okay.  So you can't again sit here and say that he was?

25   *A.*    Correct.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1  Q.   August 23rd there was a get-together at Mr. Harris's --

2  actually Mr. Harris's parents' house, I believe.  Is that

3  correct?

4  A.   Yes.

5  Q.   And that's on Lake Orion?

6  A.   Yes.

7  Q.   And at that time you attribute a statement to my client;

8  is that right?

9  A.   I would have to see the statements again, but, yes, I

10  believe so.

11  Q.   Okay.  And -- but he never indicated any operational

12  detail or plan of what was going to occur; is that right?

13  A.   I would have to review the statements.

14  Q.   Okay.  Do you have your Complaint in front of you?

15  A.   I do not.

16       MR. HILLS:  May I approach, Your Honor?

17       THE COURT:  You may.

18       MR. HILLS:  I think this goes into the next page, so

19  I want to make sure . . .

20  Q.   (BY MR. HILLS)  They are numbered paragraph 24.  Mine is

21  all marked up, but . . .

22  A.   Yes, sir.

23  Q.   When you're done, let me know.

24  A.   Yes, sir.

25  Q.   We talked previously about using a boat, about blowing up

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1   a bridge.  My question is, the statement doesn't provide any

2   operational detail; is that correct?

3   *A.*   Not referencing the boat or blowing up a bridge, that's

4   correct.

5   *Q.*   Or any operational detail?

6   *A.*   That's correct.

7   *Q.*   All right.  And you also talked a little bit about rallies

8   and people had attended rallies.  Mr. -- you have no evidence

9   that Mr. Caserta attended any rallies?

10  *A.*   Not that I'm aware of.

11  *Q.*   Okay.  September 12th through 13th was another FTX; is

12  that correct?

13  *A.*   Correct.

14  *Q.*   And it's -- I don't want to beat a dead horse, but it's

15  the same thing over and over again, the training and the

16  potlucks and different activities; is that correct?

17  *A.*   That's correct.

18  *Q.*   On this particular occasion you've testified to some

19  surveillance that was done on the governor's summer home; is

20  that correct?

21  *A.*   That's correct.

22  *Q.*   There were actually two times that surveillance occurred;

23  is that right?

24  *A.*   One prior to this, this weekend, yes.

25  *Q.*   Right.  Okay.  So I was going to get to that.  So prior to

1    this there was a surveillance; is that right?

2    A.   That's correct.

3    Q.   Mr. Caserta was never a part of that; is that right?

4    A.   He did not go on either surveillance.

5    Q.   Okay.  And then back to the September 12th through the

6    13th, he was not a part of that either; is that right?

7    A.   He did not go on the surveillance.

8    Q.   And I want to make it clear you indicated that somebody

9    expressed regret by not going on this surveillance.  That was

10   not Mr. Caserta; is that right?

11   A.   That was not Caserta.

12   Q.   And on I believe the first surveillance that we talked

13   about, that was one vehicle that went; is that right?

14   A.   That's correct.

15   Q.   The second surveillance that went included three vehicles;

16   is that correct?

17   A.   Technically two vehicles and one counter-surveillance,

18   yes.

19   Q.   Okay.  So, well, three vehicles went for the surveillance,

20   two to go across the lake and one to circle around making sure

21   that nobody was -- no feds were surveilling them, right?

22   A.   That's correct.

23   Q.   And the one that was circling around to determine no feds

24   were surveilling them was the feds?

25   A.   That's incorrect.

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1  *Q.*   Okay.  It was CHS-2?

2  *A.*   No, that was two other individuals from Michigan.

3  *Q.*   Okay.  All right.  So even though there were three

4  vehicles going multiple people in each vehicle, Mr. Caserta was

5  not among them?

6  *A.*   That's correct.

7  *Q.*   You talked about, I believe around this time maybe, about

8  a map being drawn.

9  *A.*   Correct.

10 *Q.*   You have no evidence that Mr. Caserta drew any map; is

11 that correct?

12 *A.*   That's correct.

13 *Q.*   You have no information that Mr. Caserta did any research

14 on where the governor lived; is that correct?

15 *A.*   That's correct.

16 *Q.*   He didn't provide any aerial views from Google or

17 otherwise; is that correct?

18 *A.*   Not that I'm aware of.

19 *Q.*   He didn't provide any technical advice on how to blow up a

20 bridge; is that correct?

21 *A.*   Not that I'm aware of.

22 *Q.*   There was another explosive that was -- that actually

23 detonated; is that correct?

24 *A.*   That's correct.

25 *Q.*   That's the firecracker that Mr. Graham was talking about

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1  with other components, pennies, et cetera; is that right?

2  A.  That's correct.

3  Q.  And Mr. Caserta did not provide any of the material for

4  that?

5  A.  Not that I'm aware of.

6  Q.  He didn't provide any of the knowledge for that?

7  A.  Not that I'm aware of.

8  Q.  He didn't detonate that?

9  A.  No.

10  Q.  He wasn't around when it was detonated?

11  A.  That information I cannot answer.

12  Q.  There was some information about a Taser.  You don't have

13  any information that Mr. Caserta had a Taser.

14  A.  That's correct.

15  Q.  Or pitched in for money for a Taser.

16  A.  That's correct.

17  Q.  Researched a Taser.  You don't have any information that

18  he researched a Taser.

19  A.  That's correct.

20  Q.  I think on direct examination you attributed a statement

21  to my client that "When the time comes, there will be no need

22  to try and strike fear for presence.  The fear will be

23  manifested through bullets."

24  A.  That's correct.

25  Q.  Again, no operational detail, no planning, anything like

1    that regarding this alleged conspiracy to kidnap the governor?

2    A.   That's correct.

3    Q.   So I guess to sum up the statements, my client provided no

4    operational detail at all ever through any of these text

5    messages or encrypted messages, whatever they are; is that

6    correct?

7    A.   Based on the stuff we've reviewed, that's correct.

8    Q.   Thank you.  My client made another similar statement

9    apparently on this regarding an incident after he was pulled

10   over by a police officer; is that right?

11   A.   That's correct.

12   Q.   And that was -- he was pulled over for not having

13   insurance on him, I think?  Not having the vehicle insured?

14   A.   Invalid insurance.

15   Q.   Invalid insurance.  Okay.  And my client pulled over and

16   cooperated; is that right?

17   A.   I don't have the details of it, but that's what I'm being

18   told.

19   Q.   Okay.  That there was -- you were being told that he

20   cooperated completely with the officer on-scene; is that right?

21   A.   That's correct.

22   Q.   And was this -- was Mr. Caserta pulled over as a part of

23   this investigation?

24   A.   No.

25   Q.   Okay.  And you don't have any information that my client

*CROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1    actually researched where these officers lived?

2    A.   I don't have any information.

3    Q.   No evidence that he acted on these statements in any way?

4    A.   I don't -- I don't have any information to say that.

5    Q.   Okay.  No information that he tried to do any surveillance

6    on these officers?

7    A.   I don't have any information on that.

8    Q.   Just big talk.

9    A.   I can speculate, but that's it.

10   Q.   Okay.  Now, you have no information that my client paid

11   any money to anybody for anything involving this group; is that

12   right?

13   A.   Not that I'm aware of.

14   Q.   I believe that you testified that on October 7th some of

15   these individuals came with money; is that correct?

16   A.   That's correct.

17   Q.   My client didn't come with any money; is that right?

18   A.   Your client was supposed to come but canceled and did not

19   make the trip.

20   Q.   Because he was at work.  He was working.

21   A.   That's correct.

22   Q.   And that's where he was arrested, at his work, place of

23   employment?

24   A.   That's correct.

25   Q.   And he again went cooperatively; is that right?

1    A.    Correct.

2    Q.    And nothing illegal was found on him?

3    A.    I can't speak to that, but I don't believe so.

4    Q.    His apartment was searched; is that right?

5    A.    Yes.

6    Q.    Nothing illegal was found in the apartment?

7    A.    I have not seen the report on the search at this time.

8    Q.    You know he has a CPL, concealed pistol license; is that

9    right?

10   A.    I believe so.  I'm aware of that.

11   Q.    And when he was pulled over he gave that over to the

12   officers; is that right?

13   A.    I can't speak to that.

14   Q.    I believe it was Exhibit 18, but the audio where you

15   indicate there's laughing going on in there, multiple people

16   talking, do you recall that exhibit?

17   A.    Yes, I do.

18   Q.    Mr. Caserta is not on that audio recording, is he?

19   A.    I can't confirm that.

20   Q.    Having encrypted communication is not illegal, is it?

21   A.    No, it's not.

22          MR. HILLS:  May I have just one moment, Your Honor?

23          THE COURT:  Of course.

24          MR. HILLS:  Thank you, Special Agent.

25          Nothing further.  Thank you.

1          *THE COURT:*  Thank you.

2          Mr. Graham, I had required you to go first, but if

3     you want to have another opportunity to question the agent, now

4     is probably the time.

5          *MR. GRAHAM:*  Okay.  I just actually have a couple of

6     questions I can do from right here.  And I would note,

7     Your Honor, that I was given the 26.2 -- Rule 26.2 materials,

8     had a chance to look at them while others were posing

9     questions, and so there's no complaint about that --

10         *THE COURT:*  All right.

11         *MR. GRAHAM:*  -- whatsoever.

12                          RECROSS-EXAMINATION

13    *BY MR. GRAHAM:*

14    *Q.*   Agent, you're aware that when Kaleb was arrested that he

15    had some money on him, right?

16    *A.*   I am not aware of what he had on his person.

17    *Q.*   Okay.  Were you ever told that he had $23?

18    *A.*   I was -- again, I was not told what he had on his person.

19    *Q.*   So you don't have any information about what money he

20    might have had on his person?

21    *A.*   I do not.

22    *Q.*   Okay.  Thank you.

23         *MR. GRAHAM:*  Thank you, Your Honor.

24         *THE COURT:*  Mr. Kessler, any redirect?

25         *MR. KESSLER:*  Thank you, Your Honor.

*REDIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1                          REDIRECT EXAMINATION

2     *BY MR. KESSLER:*

3     *Q.*   Agent Trask, you were asked -- I'll kind of combine all

4     these.  You were asked about other militia groups that you've

5     been involved in investigating or that you were aware of.  And

6     I think we heard various descriptions of them being at like

7     potlucks or a bunch of military wannabes or they are just

8     crackpots that talk amongst themselves.  That does exist out

9     there, right?

10    *A.*   That's correct.

11    *Q.*   As you acknowledged.  But you've got to pay attention to

12    what they say, correct, when they are there?

13    *A.*   That's correct.

14    *Q.*   In all these investigations do you normally hear them

15    openly talking about committing crimes?

16    *A.*   No, we do not.

17    *Q.*   Okay.  Like kidnapping, for example, would be something

18    you would pay attention to?

19    *A.*   That's correct.

20    *Q.*   And you have to pay attention to what they do, right?

21    *A.*   That's correct.

22    *Q.*   So training with firearms, as everyone has pointed out, is

23    not illegal, right?

24    *A.*   That's correct.

25    *Q.*   Have you seen other militia groups doing their legitimate

*REDIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    trainings where they have gone and cased somebody's house?

2    A.   I have not.

3    Q.   Okay.  You've never run across that in all your

4    investigations?

5    A.   I have not.

6    Q.   Okay.  The attorney for Kaleb Franks asked you about a

7    statement where he said he was not okay with kidnapping.  And

8    you put that in your Affidavit, right?

9    A.   That's correct.

10   Q.   But that was before September 12th or 13th?

11   A.   Correct.

12   Q.   12th or 13th, right?  Where Mr. Franks actually went and

13   cased the governor's house?

14   A.   That's correct.

15   Q.   At night?

16   A.   That's correct.

17   Q.   And a number of that group were armed.

18   A.   That's correct.

19   Q.   Okay.  We've heard a lot of counsel here talking about

20   things that aren't illegal like having guns or going to

21   potlucks or whatever, but nobody has mentioned that one as

22   being something that's okay.

23   A.   That's correct.

24   Q.   And is a red flag for you, correct?

25   A.   Yes.

*REDIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    Q.    As a matter of fact, as to the implication that people

2    were just going on a ride, if anybody is saying that, there was

3    another individual, one of those Michigan individuals who is

4    charged by the state, who went home that night, right?

5    A.    That's correct.

6    Q.    He was in the cars and after that he didn't come back for

7    the meeting?

8    A.    Correct.

9    Q.    And he was on the encrypted chats with the other members

10   later and said, "I'm not going to jail for this," or words to

11   that effect, didn't he?

12   A.    That's correct.

13   Q.    There was another member identified as a Wisconsin

14   individual who also apparently told a Wisconsin CHS that if

15   that's what the Michigan militia people are about, I want

16   nothing to do with it.  Or words to that effect.

17   A.    That's correct.

18   Q.    Okay.  So these are not the normal trainings that you've

19   seen in other militias where it's just getting together for a

20   potluck and shooting some guns?

21   A.    That's correct.

22   Q.    You had some questions about whether the CHS was the

23   leader who was pushing things.  And I know you said that that

24   was not the case to your knowledge.  Is there someone in this

25   room who was a leader who was pushing the others?

*REDIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1    A.    Yes.

2    Q.    Who was that?

3    A.    Adam Fox.

4    Q.    Adam Fox does not work for the government, correct?

5    A.    That's correct.

6    Q.    You were also asked if there was protocol for handling

7    informants, whether, you know, they -- I think the specific

8    question was are they -- do they encourage subjects to commit

9    criminal acts or talk about what they are doing.  You'd never

10   have an informant encourage anybody to commit a criminal act,

11   right?

12   A.    That's correct.

13   Q.    But you do, of course, try to encourage -- the informant

14   would try to encourage people to talk about what they are doing

15   because that's how you learn, right?

16   A.    That's correct.

17   Q.    And that's how you investigate and stop something before

18   it happens?

19   A.    Yes, it is.

20   Q.    I think you had a question about the explosives that were

21   supposed to go under the bridge.  The implication being a small

22   IED made from a firecracker can't take down a bridge, right?

23   But that's not to your knowledge what those IEDs were intended

24   for, right?

25   A.    That's correct.

REDIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1   Q.   Those actually had shrapnel like pennies or BBs wrapped

2   around them, right?

3   A.   That's correct.

4   Q.   And did they not at the second FTX actually put up

5   silhouette targets of human beings to see if that shrapnel

6   would pierce them?

7   A.   Yes, they did.

8   Q.   So those were meant for antipersonnel devices, not for

9   blowing up a bridge?

10  A.   That would be correct.

11  Q.   But the bridge, that's what the $4,000 was supposed to be

12  for, right?

13  A.   Correct.

14  Q.   For more powerful explosives.

15       Counsel for Mr. Franks and Mr. Caserta both pointed out

16  that neither one of them was particularly involved with

17  explosives.  Nobody is charged with an explosives charge here,

18  right?

19  A.   That's correct.

20  Q.   That's just a part of it?

21  A.   Correct.

22  Q.   Okay.  So not everybody has to be involved in every

23  aspect.  People have different jobs, right?

24  A.   That's correct.

25  Q.   Like one car went to the boat ramp and one car went to the

REDIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER

1  house.

2  A.   Yes.

3  Q.   Okay.  Mr. Caserta in particular it was talked about that

4  he was not involved with the explosives, but we saw his chat

5  messages, right, where he was interested in training for asset

6  extraction?

7  A.   That's correct.

8  Q.   And that would be in the basement of the Vac Shack?

9  A.   Correct.

10 Q.   And he specifically said they needed to keep a low

11 profile.  They didn't need to manifest through -- manifest

12 their actions through being seen or something to that effect,

13 right?

14 A.   That's correct.

15 Q.   We also heard a question about how just because somebody

16 is on the chats, we see all their names on the chats, if they

17 are silent, they might have read it or might not have done

18 anything, but when they talk you know they are involved, right?

19 A.   That's correct.

20 Q.   So back to Exhibit Number 10 which was the one where they

21 were called The Bonfire Party.  We went through it and every

22 one of the people in this room actually was freaked out, we saw

23 their own words, that they might have a mole or a fed so that

24 the feds could find out what they were talking about, right?

25 A.   That's correct.

*REDIRECT EXAMINATION OF RICHARD TRASK BY MR. KESSLER*

1   *Q.*   Okay.  So as counsel has pointed out, not illegal to have

2   encrypted chats, right?  People do that for all kinds of

3   reasons, right?

4   *A.*   That's correct.

5   *Q.*   You've seen encrypted chats used by other groups, right?

6   *A.*   Yes.

7   *Q.*   Have you seen a lot of other cases where people are

8   worried to this extent about being infiltrated by the feds?

9   *A.*   I have not, unless there is some purpose for being worried

10  about that.

11  *Q.*   Okay.  So that's a red flag for you as well, right?

12  *A.*   Yes, it is.

13  *Q.*   Other ones where they are just gathering for camaraderie

14  or to be military wannabes or whatever, just to train on their

15  firearms proficiency, you haven't seen other ones like that

16  that weren't involved in terrorism where they made people bring

17  identity documentation to prove who they really were, have you?

18  *A.*   I have not.

19  *Q.*   So I guess I'll just conclude on that notion.  You've

20  heard from almost everybody that there were one or two things

21  that they picked out that their client didn't do or that they

22  did do that wasn't illegal.  The FBI also investigates bank

23  robberies, right?

24  *A.*   That's correct.

25  *Q.*   Not illegal to have a ski mask?

*RECROSS-EXAMINATION OF RICHARD TRASK BY MR. HILLS*

1    *A.*   No.

2    *Q.*   It's not actually illegal to drive by a bank in the middle

3    of the night --

4              *MR. GRAHAM:*  I object, Your Honor.  It's not

5    relevant.  It's argumentative.

6              *THE COURT:*  Mr. Graham is correct.

7    *Q.*   *(BY MR. KESSLER)*  Those things are evidence, right?

8    *A.*   That's correct.

9              *MR. KESSLER:*  That's all I have, Your Honor.

10              *THE COURT:*  Any recross, Mr. Graham?

11              *MR. GRAHAM:*  No, Your Honor.  Thank you.

12              *THE COURT:*  Mr. Douglas.

13              *MR. DOUGLAS:*  No, Your Honor.

14              *THE COURT:*  And Mr. Hills.

15              *MR. HILLS:*  Yes, Your Honor.

16                          RECROSS-EXAMINATION

17    BY MR. HILLS:

18    *Q.*   The conversation regarding asset extraction, that was a

19    training that was supposed to take place at the Vac Shack; is

20    that right?

21    *A.*   That's correct.

22    *Q.*   And that never happened; is that right?

23    *A.*   It did not.

24    *Q.*   And to your knowledge my client, Mr. Caserta, has never

25    been at the Vac Shack?

1    *A.*    That's correct.

2    *Q.*    Thank you.

3              *THE COURT:*  Any further proofs from the government?

4              *MR. KESSLER:*  No, Your Honor.

5              *THE COURT:*  All right.  At this point we're going to

6    take a recess.  It is not clear to me whether or not we have

7    access to this courtroom for the rest of the afternoon.  If we

8    do not, we will switch to my courtroom and take argument

9    individually.  If we're able to do it together, we will.  But

10   if not, we'll just take it individually.  So someone will let

11   you know shortly.

12             Yes, Mr. Graham.

13             *MR. GRAHAM:*  Your Honor, I guess I have a question

14   about how best to proceed on this while protecting everybody's

15   rights.  And I pose this as a true question.  I just don't

16   know.  I'm just trying to problem solve.  My understanding is

17   that two defendants are reserving their right to cross-examine

18   the witness.  I'm not asking for any further permission to

19   cross-examine the witness, but I'm wondering -- I guess from my

20   perspective I would rather wait and make my argument to you

21   after all of the evidence is done, just because I don't know

22   what's going to happen, you know, exactly.  So I just wanted to

23   let you know that my request is to -- now, I've had my chance

24   to cross.  I'm not asking for any further chance unless

25   something is said, you know, that opens the door to something.

1    I'm not asking for any further chance.  And I guess I would

2    make the request to put off a decision on the hearing until

3    after everybody has questioned the witness.

4              THE COURT:  That's fine.  We have a little bit more

5    time in terms of the preliminary hearing, obviously, than we do

6    for the question of bond.  So having the witness testify today

7    allows everybody to have the baseline, I think, of information

8    that they can use for their bond arguments, and we can talk

9    about defendant-specific information at those particular

10   hearings.  So I don't have -- unless the government has some

11   reason to object, I don't have a problem with putting off the

12   argument on the preliminary hearing.

13             MR. KESSLER:  No, I don't object, Your Honor, as long

14   as we're not talking about -- some of the same information

15   that's going to go into the detention decision, I wouldn't want

16   it to, you know, affect the decision today on that.  As long as

17   nobody is getting out just because, you know, the prelim is

18   being put off until Friday.

19             THE COURT:  Correct.

20             MR. GRAHAM:  I'm not asking for that.

21             THE COURT:  Yeah, so the prelim we just need to do

22   within 14 days or have a decision made on within 14 days.  I

23   did want to have the witness testify today so that we had the

24   record in place so the parties can argue for bond or against

25   bond on that basis.

```
 1              Mr. Douglas, do you -- is that your position as well?
 2              MR. DOUGLAS:  Yes, it is, Your Honor.
 3              THE COURT:  All right.  And Mr. --
 4              MR. HILLS:  Hills.
 5              THE COURT:  Counsel.  Mr. Hills.  Sorry.  Too many
 6    people in the courtroom.
 7              MR. HILLS:  I'm good either way.
 8              THE COURT:  All right.  In that case let me figure
 9    out what our courtroom availability is today and how we should
10    best proceed.  And we can make a determination about how to do
11    bond hearings going forward this afternoon.  But those, I
12    think, can more easily be done in the small courtroom in any
13    case.
14              Mr. Kessler, anything else we need to take up from
15    the government's perspective?
16              MR. KESSLER:  No, Your Honor.  Thank you.
17              THE COURT:  From defense counsel anything else?
18              MR. GRAHAM:  No.
19              MR. SPRINGSTEAD:  No, Your Honor.
20              THE COURT:  All right.  We'll be adjourned.
21              THE CLERK:  All rise, please.  Court is adjourned.
22         (Proceeding concluded at 1:04 p.m.)
23                       *   *   *   *   *
24
25
```

```
 1                        CERTIFICATE

 2          I certify that the foregoing is a transcript from the

 3   Liberty Court Recording System digital recording of the

 4   proceedings in the above-entitled matter, transcribed to the

 5   best of my ability.

 6          I further certify that the transcript fees and format

 7   comply with those prescribed by the court and the Judicial

 8   Conference of the United States.

 9

10   October 14, 2020

11

12                         /s/ Glenda Trexler
                           Glenda Trexler, CSR-1436, RPR, CRR
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              *EXAMINATION INDEX*

2                                          *PAGE*

3    *RICHARD TRASK*

4        *DIRECT EXAMINATION BY MR. KESSLER:*        6

5        *CROSS-EXAMINATION BY MR. GRAHAM:*         89

6        *CROSS-EXAMINATION BY MR. DOUGLAS:*       129

7        *CROSS-EXAMINATION BY MR. HILLS:*         133

8        *RECROSS-EXAMINATION BY MR. GRAHAM:*      148

9        *REDIRECT EXAMINATION BY MR. KESSLER:*    149

10       *RECROSS-EXAMINATION BY MR. HILLS:*       156

11                   *        *        *        *        *

12                *EXHIBIT INDEX*

13   *EXHIBIT*                          *OFFERED*   *ADMITTED*

14   *GVT  1    Photo*                      21         21

15   *GVT  2    Photo*                      27         27

16   *GVT  3    Text string*               30         30

17   *GVT  4    Text string*               30         30

18   *GVT  5    Video*                      32         33

19   *GVT  6    Video*                      33         33

20   *GVT  7    Text string with photo*    35         35

21   *GVT  8    Video*                      36         36

22   *GVT  9    Photo*                      38         38

23   *GVT 10    Text string*               45         45

24   *GVT 11    Threema.Web screen shot*   47         47

25   *GVT 12    Photo*                      48         48

| | | | | |
|---|---|---|---|---|
| 1 | GVT 13 | Photo | 49 | 49 |
| 2 | GVT 14 | Note paper with sketch and | 51 | 51 |
| 3 | | notations | | |
| 4 | GVT 15 | Text string with photos | 53 | 53 |
| 5 | GVT 16 | Text string with photos | 55 | 55 |
| 6 | GVT 17 | Text string with photo | 67 | 67 |
| 7 | GVT 18 | Audio recording | 70 | 70 |
| 8 | GVT 19 | Chat string | 76 | 76 |
| 9 | GVT 20 | Text string | 81 | 82 |
| 10 | GVT 21 | Video | 84 | 85 |
| 11 | GVT 22 | Text string | 89 | 89 |

12
13
14
15
16
17
18
19
20
21
22
23
24
25